**FORMIGLI CORPORATION**

v.

**William L. FOX, Individually and t/a Foxcroft Square Company, et al.**

**Civ. A. No. 44343.**

United States District Court,
E. D. Pennsylvania.

Sept. 12, 1972.

Raymond W. Midgett, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

J. Paul Erwin, Jr., White & Williams, Philadelphia, Pa., for defendants.

FINDINGS OF FACT, DISCUSSION,
CONCLUSIONS OF LAW,
AND ORDER

HANNUM, District Judge.

## FINDINGS OF FACT

*The Parties and Jurisdiction*

1. Plaintiff, Formigli Corporation, is incorporated in Delaware and is successor by merger to Formigli Corporation, which at the time of commencement of this action was incorporated in New Jersey and had its principal place of business in New Jersey ("Formigli").

2. Defendants are William L. Fox, Irwin C. Fox and Dorothy Kotin (Mrs. Edward Kotin), and Foxcroft Square Company, which is the partnership of which the individual defendants are partners. Messrs. Fox and Mrs. Kotin are all residents and citizens of Pennsylvania. (William L. Fox is referred to as "Fox" and all of the defendants are collectively "Foxcroft".)

3. The amount in controversy, exclusive of interest and costs, is a sum in excess of $10,000.00.

*The Contract Between the Parties*

4. This is a suit on a contract between Foxcroft, which is a building contractor and Formigli, which was one of Foxcroft's subcontractors, arising out of the construction of a multi-story building in Abington Township, Pennsylvania. The building is known as the Benjamin Fox Pavilion and contains retail stores in its lower levels and seven stories of offices.

5. Formigli entered into a written agreement with Foxcroft dated June 21, 1965, in which Formigli agreed to furnish certain labor and materials, including all precast concrete work for the Benjamin Fox Pavilion, for a price of $1,459,000 ("the written agreement").

6. The engineering design necessary for the work to be done by Formigli for the Benjamin Fox Pavilion was provided by Irwin J. Speyer, an independent professional engineer who was commissioned and paid by Formigli for this project. Speyer is a structural engineer with approximately 20 years of experience. Since 1953 he has specialized in the design of structures made with prestressed precast concrete. Speyer participated in the preparation of the American Concrete Institute requirements for the design of concrete structures.

7. The engineering design provided by Speyer was based on architectural plans prepared by George S. Idell, an architect who acted for Foxcroft with respect to the work at the Benjamin Fox Pavilion. Speyer's design was submitted to and approved by Idell.

8. Based upon architectural drawings prepared by Idell and drawings and calculations furnished by Speyer, Formigli's drafting department prepared "shop drawings", according to which the precast concrete elements (including columns, beams, Spancrete (a precast concrete planking) and exterior wall panels) were fabricated, and "erection drawings", according to which the precast concrete elements were erected.

9. The Formigli shop and erection drawings were submitted to and approved by Speyer, Idell and Foxcroft prior to the start of fabrication.

10. Substantially all the precast concrete elements for the Benjamin Fox Pavilion were fabricated by Formigli and delivered to the jobsite.

11. Substantially all the precast concrete elements for the Benjamin Fox Pavilion were erected at the jobsite by Berry-Baschoff, Inc., a subsidiary of Formigli.

*Changes In The Scope Of The Work*

12. With respect to changes in the scope of the work, the written agreement provided: "There shall be no extra charges to complete work called for under this contract. However, the party of the first part (Foxcroft), without invalidating the Contract, may order extra work or make changes by altering,

adding to, or deducting from the work, the Contract Sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract."

13. With respect to additions, omissions and changes in the work as called for by the written agreement:

a.—Items which were not in dispute, when set off, result in a net decrease in the contract price of $27,921.00.

b.—To narrow the issues to be tried the parties agreed to compromise certain other items which, when set off, result in an increase in the contract price of $21,359.60.

c.—The parties did not agree upon the price adjustments, if any, to be made for items 3B, 4, 5 and 13B of Exhibit P–3, which are referred to in paragraphs 14 to 17 below.

14. Item 3B of Exhibit P–3 is a claim by Formigli for an addition to the contract price in the amount of $3,296 for "Add four spandrel beams and four one-story columns to enclose garage where ramp was eliminated." The contract drawings showed a circular garage ramp most of which was inside the perimeter of the rear of the garage and some of which was outside the perimeter of the garage. The contract price included the precast concrete components for that ramp. Formigli offered Foxcroft a credit of $30,000 if Foxcroft would provide at its expense a poured-in-place circular ramp at the same location. Eventually, Foxcroft changed the design of and relocated the garage ramp so that a void was left in the perimeter of the garage. To complete the structure at that place where the ramp had been removed, Formigli supplied four additional beams and four additional columns. Formigli and Foxcroft agreed that Foxcroft was entitled to a credit of $30,000 (which has been included in the calculation of items not in dispute set forth in paragraph 13a, above). The value of the four additional beams and four additional columns furnished by Formigli was $3,296. Formigli is entitled to an increase in the contract price in that amount.

15. Item 4 of Exhibit P–3 is a claim by Formigli for an addition to the contract price in the amount of $10,599 for "Use of dish-shaped panels in lieu of channel-shaped wall panels in center bay front and building ends." Up to the time that the written agreement was entered into and thereafter to mid-August 1965, the parties had expected to use exterior wall panels of the same so-called "channel shape" across the entire front and ends of the office building tower. About August 18 or 19, 1965, Foxcroft's architect changed his design to specify a different type of exterior wall panel (one with a circular dish-shaped depression) for the two ends and an area in the center of the front of the office tower. The revised design also omitted several windows thereby increasing the area for which Formigli was to supply wall panels. The change increased the cost of the panels for the affected areas by $10,599. Formigli is entitled to an increase in the contract price in that amount.

16. Item 5 of Exhibit P–3 is a claim for an addition to the contract price in the amount of $6,814 for "Change in size of two exterior stair towers. A.—Increased area of wall panels. Add: $6,530. B.—Additional beam length. Add: $284. The locations of two exterior fire stair towers were changed by Foxcroft from the locations shown on the contract drawings. The change in location resulted in an overall increase in the area of exterior wall panels and length of beams furnished by Formigli. The increase in cost attributable to the increase in materials was $6,814. Formigli is entitled to an increase in the contract price in that amount.

17. Item 13B of Exhibit P–3 is a claim for an addition to the contract price in the amount of $1,500 for "Additional engineering time". Speyer's original contract with Formigli contemplated payment by Formigli to Speyer of a fee of $10,000. However, because of changes made by Foxcroft's architect in the lo-

cation and shape of the building that required Speyer to make revisions of his then-completed structural drawings and to make additional calculations, Speyer charged Formigli the additional $1,500 for his additional engineering time. Formigli is entitled to an increase in the contract price in that amount.

*Billings and Payments*

18. The written agreement provided that Formigli would be paid 90% of the value of work as the work progressed on approval of the building architect. The remaining 10% was to be paid 120 days after completion of the work and acceptance of it by the building architect.

19. Formigli submitted invoices to Foxcroft for work performed under the written agreement on or about the dates and in the amounts set forth below:

| Invoice No. | Date | Invoice Amount | Retainage on Invoice Amount | Net amount Billed on Invoice date |
|---|---|---|---|---|
| 1989 | 10/29/65 | $ 25,200.00 | $ 2,252.00 | $ 22,680.00 |
| 1996 | 11/10/65 | 14,192.40 | 1,419.24 | 12,773.16 |
| 2064 | 2/2/66 | 9,074.00 | 907.40 | 8,166.60 |
| 2256 | 9/30/66 | 141,203.60 | 14,120.36 | 127,083.24 |
| 2275 | 10/31/66 | 248,030.00 | 24,803.00 | 223,227.00 |
| 2309 | 11/30/66 | 145,900.00 | 14,590.00 | 131,310.00 |
| 2325 | 12/30/66 | 145,900.00 | 14,590.00 | 131,310.00 |
| 2348 | 1/31/67 | 245,500.00 | 24,550.00 | 220,950.00 |
| 2366 | 2/28/67 | 119,250.00 | 11,925.00 | 107,325.00 |
| 2387 | 3/31/67 | 72,950.00 | 7,295.00 | 65,665.00 |
| 2411 | 4/28/67 | 218,850.00 | 21,885.00 | 196,965.00 |
| 2433 | 5/19/67 | 14,590.00 | 1,459.00 | 13,131.00 |
| 2504 | 7/31/67 | 58,360.00 | 5,836.00 | 52,524.00 |

20. Each Formigli invoice indicated the value of the material and labor furnished to the job-site to the date of the invoice.

21. On or about August 30, 1967, Formigli submitted to Foxcroft a letter statement of the adjustments in the contract price arising from additions, omissions and changes in work which included the adjustments referred to in paragraphs 13 to 17 above.

22. The adjustments set forth in the letter statement from Formigli to Foxcroft dated August 30, 1967 for items 3B, 4, 5 and 13B were the fair value of those additions, omissions and changes that are referred to in paragraphs 14 to 17 above, and were calculated in accordance with the applicable provisions of the written agreement.

23. Payments totalling $1,160,254.88 were made for the work under the written agreement. Such payments were made on or about the dates and in the amounts set forth below:

| Date | Amount |
|---|---|
| 2/ 4 /66 | 35,335.35 |
| 3/22/66 | 8,664.29 |
| 4/19/66 | 60,000.00 |
| 10/15/66 | 67,083.24 |
| 11/ 8 /66 | 223,227.00 |
| 12/ 9 /66 | 131,310.00 |
| 1/12/67 | 131,310.00 |
| 2/13/67 | 150,000.00 |
| 3/14/67 | 107,325.00 |
| 4/14/67 | 50,000.00 |
| 5/11/67 | 100,000.00 |
| 6/ 7 /67 | 96,000.00 |

In addition Formigli credited Foxcroft's account in the amount of $540.61 on April 19, 1966.

24. During the period from September 1966 through January 1967, Foxcroft paid Formigli within 30 days after

the submission of its invoices. However, commencing in February 1967, Foxcroft withheld payment of substantial amounts in excess of the retainage provided for in the written agreement.

From the submission of the Formigli invoice number 2348 on or about January 31, 1967, the amounts in excess of the retainage that remained unpaid by Foxcroft were as set forth below:

| | Balances | | |
| Date | Earned but Unpaid | Retainage | Net Amount Due this Date |
|---|---|---|---|
| 1/31/67 | $317,529.51 | $ 97,500.00 | $220,029.51 |
| 2/13/67 | 167,529.51 | 97,500.00 | 70,029.51 |
| 2/28/67 | 286,779.51 | 109,425.00 | 177,354.51 |
| 3/14/67 | 179,454.51 | 109,425.00 | 70,029.51 |
| 3/31/67 | 252,404.51 | 116,720.00 | 135,684.51 |
| 4/14/67 | 202,404.51 | 116,720.00 | 85,684.51 |
| 4/28/67 | 421,254.51 | 138,605.00 | 282,649.51 |
| 5/11/67 | 321,254.51 | 138,605.00 | 182,649.51 |
| 5/19/67 | 335,844.51 | 140,064.00 | 195,780.51 |
| 6/7/67 | 239,844.51 | 140,064.00 | 99,780.51 |
| 7/31/67 | 298,204.51 | 145,900.00 | 152,304.51 |

25. As of July 31, 1967, the outstanding balance invoiced by Formigli to Foxcroft was $298,204.51 of which $145,900.00 was retainage and $152,304.51 was then due.

26. There is a net increase in the contract price resulting from the changes in the work as set forth in paragraphs 13 to 17, above, in the amount of $15,647.60, calculated as follows:

Increases attributable to:

| | |
|---|---|
| Items compromised (paragraph 13b, above) | $21,359.60 |
| Item 3B (paragraph 14, above) | 3,296.00 |
| Item 4 (paragraph 15, above) | 10,599.00 |
| Item 5 (paragraph 16, above) | 6,814.00 |
| Item 13B (paragraph 17, above) | 1,500.00 |
| | 43,568.60 |
| Decrease attributable to items not in dispute (paragraph 13a, above) | 27,921.00 |
| Net Increase in contract price | $15,647.60 |

27. As of October 22, 1967, the Foxcroft accounts payable card admitted a balance due Formigli of $301,265.06 but this sum includes a credit to Formigli of only $2,520. for certain extra work and does not take the debit of $540.61 corresponding to the credit awarded by Formigli on April 19, 1966.

28. For many months prior to July 31, 1967, Formigli had called to the attention of Foxcroft that substantial amounts were due to it since January of 1967 and demanded payment.

*The Status As of August, 1967*

29. On or about August 8, 1967, Robert J. Stoelker, then a Formigli Vice President, met with Fox at the Benjamin Fox Pavilion and, among other things, demanded payment of the out-

standing balance invoiced by Formigli to Foxcroft but not including the amount withheld by Foxcroft as retainage. The primary purpose of the meeting was to discuss the payments due on the Formigli account. At that meeting, Fox told Stoelker that the reason Formigli had not been paid was that the insurance company which was lending money to Foxcroft had not approved payment to it. After some discussion, Fox agreed to obtain money from another source and pay Formigli, however, no such payment was ever made. In that meeting, Fox also expressed some dissatisfaction with Formigli's work and asked that some corrections be made. Stoelker did not dispute that there were some minor corrective and completion work to be done but stated Formigli's unwillingness to complete that work in view of the substantial past-due balance owed by Foxcroft to Formigli.

30. As of August, 1967, the Formigli construction at the Benjamin Fox Pavilion was incomplete in that about 10% of the caulking of exterior wall panels remained to be done, there was a small portion of the garage not yet erected because the foundation or other field work was not ready to receive it, and there were minor spalls on the exterior of the building to be patched. These items had an aggregate value of approximately $5,600 and were an insignificant part of the work called for by the agreement between the parties.

*Foxcroft's Claimed Set-Offs*

31. At various times after the meeting of Stoelker and Fox on or about August 8, 1967 which is referred to in paragraph 29, above, Foxcroft had claimed set-offs against the balance of the contract price otherwise due Formigli arising out of the following:

a. Incomplete work which is referred to in paragraph 30, above;

b. The condition of the exterior wall panels which is referred to in paragraphs 32 to 41, below;

c. The caulking of the joints between exterior wall panels which is referred to in paragraphs 42 to 46, below;

d. The condition of the parking garage deck which is referred to in paragraphs 47 to 63 below;

e. The spalling of a beam in the parking garage at column line 44MN which is referred to at paragraphs 64 to 67, below;

f. Alleged defective workmanship of Formigli which is referred to in paragraphs 68 to 75, below;

g. The freezing of water in certain parking garage beams which is referred to in paragraphs 76 to 81, below;

h. The assertion of a claim against Foxcroft and Formigli by Tribuiani, another subcontractor of Foxcroft, which is referred to in paragraphs 82 to 84, below;

i. The filing by Formigli of a mechanic's lien against Foxcroft Square Pavilion, Inc., which is referred to in paragraphs 85 and 86, below;

j. Three deflected beams which is referred to in paragraph 87, below, and,

k. Improper design of the composite beams which is referred to in paragraph 88, below.

*The Exterior Wall Panels*

32. In December 1965, Mr. and Mrs. William L. Fox, Idell and Partridge met Stoelker and DiSanti at Formigli's plant in New Jersey, to inspect sample exterior wall panels which had been fabricated by Formigli for erection at the Benjamin Fox Pavilion. Stoelker explained that a more uniform appearance could be obtained with the more expensive white cement or an exposed aggregate finish. Although Mrs. Fox expressed her dissatisfaction with their appearance, William Fox and Idell approved the samples of the smooth-finish exterior wall panels made with standard light grey cement.

33. Foxcroft's decision to specify smooth-finish exterior panels made with standard light grey cement was made with the knowledge that such panels would be less expensive but would be subject to greater variation in color and finish.

34. Foxcroft had Earl Hart, an experienced construction superintendent, in charge at the Benjamin Fox Pavilion throughout the entire period that Formigli's erection work, including the erection of the exterior wall panels, was being done. In addition, the jobsite was seen daily by Partridge, whom Fox had designated as Foxcroft project superintendent, and visited by Fox whose office was across the street from the jobsite.

35. Foxcroft made no complaint to Stoelker about the smooth-finish exterior wall panels prior to the meeting with Fox at the jobsite in August 1967. The only other references to the appearance of these panels was a letter dated November 11, 1966, from Fox to Theodore Schwaab, who was in charge of engineering and scheduling for Formigli, and a casual conversation between Idell and Paul Formigli, a Formigli executive, not active in this job, suggesting the need for some repair work.

36. Throughout the period that Formigli delivered and erected the smooth-finish exterior wall panels which occurred over several weeks, no request was made by Foxcroft to remove or replace the smooth-finish exterior wall panels which had been erected.

37. There were some areas on the front wall of the building which were to have dish-shaped panels. After the initial erection of a small number of dish-shaped panels, Foxcroft expressed dissatisfaction with their appearance. Formigli removed those dish-shaped panels and replaced them with other dish-shaped panels in which the concrete mix had been changed to white quartz and the aggregate in the dish portion was exposed. Formigli bore the entire cost of this substitution which amounted to $4,000.

38. The original schedule for Formigli's fabrication and erection of the precast concrete elements called for erection to begin about January, 1966 with fabrication at Formigli's plan to begin in advance of that date. Fabrication did begin on schedule. However, by late 1965 it became apparent that the erection schedule could not be met because Foxcroft's work in clearing the site and preparing the foundation had not progressed on schedule. Accordingly, Formigli's fabrication was interrupted and erection postponed. Ground breaking occurred in late February 1966. Thereafter, excavation began, poured-in-place concrete such as retaining walls and footings were installed, and underground plumbing and electrical work was done. Formigli resumed fabrication of the precast elements at its plant about June 1966. Formigli's work at the jobsite began with the erection of the superstructure in early September 1966.

39. The variations in the color and texture of the surface of exterior wall panels result from: (a) properties inherent in the use of the standard light grey cement; and (b) the Foxcroft change of schedule which resulted in the storage for months and substantial delay in the erection of some of the exterior wall panels and in the interruption for several months of the fabrication of exterior wall panels.

40. As of August, 1967, there were, in Stoelker's opinion, approximately 15 exterior panels which were dirty or stained in some fashion and which did not conform to the samples that earlier had been shown to the architect.

41. In August 1967, the cleaning, patching and other work on the exterior wall panels then contemplated by Formigli would have cost approximately $15,000 or $20,000.

*The Caulking of Exterior Wall Panels*

42. During the period immediately preceding September 26, 1969, Melrose Waterproofing Company examined the entire outside of the Benjamin Fox Pavilion, recaulked joints to the extent it

thought necessary, and patched spalls and cracks in exterior wall panels and the panel from which a piece of concrete had fallen.

43. Melrose billed Foxcroft Building Corporation, which is not a party to this action, $8,990 for the work described in paragraph 42, above. The Melrose estimate for the caulking alone was $7,990.

44. The initial caulking of the exterior wall panels was done by Culbertson Caulking Company for Formigli. Foxcroft did not complain to Formigli about the manner in which Culbertson did the caulking.

45. During the period Culbertson was doing the caulking, it reported to Partridge of Foxcroft:

"Job examination of Monday, July 3, (1967) revealed a considerable amount of water present on the uncompleted roof and water penetration down behind the concrete panels to the floor below.

"As our caulking was just being installed and not yet fully cured, we must urge you to keep water from attaching this material from the inside of the joint or the Manufacturer warns of serious damage and loss of adhesion could result.

"Your prompt attention to this matter will be in both our common interest."

Partridge could not recall what action, if any, he took with respect to Culbertson's complaint.

46. Foxcroft has not proven what portion, if any, of the work done by Melrose two years after Formigli stopped work and billed to Foxcroft Building Corporation at $8,990 was caused by any Formigli breach of the written agreement.

*The Parking Garage Deck*

47. The engineering design of the parking garage deck was provided by Speyer. That design complied with the applicable codes and standards for parking garages: the standards then-established by the Commonwealth of Pennsylvania and the American Concrete Institute Building Code, Standard Building Code Requirements for Reinforced Concrete 318–63, dated 1963 ("the ACI code").

48. The ACI code includes standards for the allowable deflection (or flexibility) of precast beams and members used in a structure such as the parking garage at the Benjamin Fox Pavilion.

49. The deflection for the precast members furnished for the parking garage deck was, in every case, less than the ACI code permitted. The deflection for the Spancrete planks used in the garage was only one-fourth to one-eighth of the deflection allowed by the ACI code. The deflection for the beams used in the garage was no more than one-fourth of the deflection allowed by the ACI code. Thus, all these members and the garage structure were much stiffer than the ACI code required.

50. Speyer's design and the Formigli drawings for the parking garage deck were submitted to and approved by Idell.

51. As the structural engineer, Speyer's responsibility with respect to the waterproofing of the parking garage deck was to design a deck which would support the weight of waterproofing materials normally used for such applications. As Foxcroft's architect, Idell's responsibility was to specify the method and materials to be used for the waterproofing of the garage deck just as he had a similar responsibility for specifying the methods and materials to be used in roofing and waterproofing the office building tower. Foxcroft had the ultimate responsibility to select and to see to the application of the particular kind of waterproofing finally selected.

52. Early in the project, there had been discussion of waterproofing the parking garage deck by covering the concrete topping with a waterproof membrane and a blacktop wearing surface.

53. Speyer designed the parking garage deck so that it could support, in addition to the concrete topping and its anticipated load of motor vehicles, a waterproof membrane and a bituminous or

blacktop wearing surface two inches thick.

54. Speyer specifically called to the attention of Idell and Foxcroft the need for waterproofing the parking garage deck. This matter was raised in the following ways, among others: (a) letters and conversations between Speyer and Idell and his representatives; (b) a manuscript note by Speyer on the copy of Formigli erection drawing G–4 which was sent to Idell for approval; and (c) referring to Foxcroft two companies which provide waterproofing materials for applications of this type. Idell expressly recognized the need for a waterproof finish or topping on the parking deck in revision 23 of his architectural drawing number 7.

55. Foxcroft rejected the suggestion that the parking garage deck be waterproofed with a membrane waterproofing and blacktop wearing surface. Until the trial, Foxcroft continued to reject the need for a waterproofing membrane and wearing surface.

56. Foxcroft decided to apply silicone to the parking garage deck and to caulk the construction and expansion joints and cracks after they appeared in the concrete topping of the deck.

57. Apart from the initial application of silicone material to cure and seal the concrete and the initial caulking of the construction and expansion joints with Thiokol, Foxcroft first considered waterproofing the garage deck only after the building was occupied, the deck was in use, cracks had appeared, and the deck was leaking.

58. Cracking of the poured concrete topping on the parking deck is a normal development which is anticipated by persons familiar with the characteristics of poured concrete. Concrete is a non-elastic material. It is not resilient. It cracks with changes in temperature. The principles upon which a concrete structure is designed presume cracking. Concrete cannot be made impervious to water by coating of the surface or caulking cracks because the surface cracks and the cracks continue to grow.

59. In considering whether to waterproof the garage deck, Fox did not expect the concrete topping on the deck to wear and crack.

60. The methods that have been used by Foxcroft in its attempt to waterproof the garage deck were applied in ignorance of the physical qualities of concrete, were inappropriate for waterproofing a concrete parking garage deck and were a waste of time and money.

61. Throughout the period that the parking garage deck was being designed by Speyer, the shop and erection drawings were being prepared by Formigli and the precast components were being fabricated by Formigli and were being erected by Berry-Baschoff, Inc., the architectural drawings prepared by Idell showed the intended use of the entire space below the parking garage deck as an open garage and did not show the use of that space for a store or other tenant-occupied interior space. Speyer and Formigli did not know that a portion of the parking garage was going to be used for some other purpose until January, 1968, which was months after Formigli had left the job.

62. If the entire parking garage structure had been devoted to parking, as originally planned, even a wearing surface on the deck might have provided sufficient water-repelling action to permit parking on the lower levels. However, when Foxcroft decided to occupy a portion of the middle level of the parking garage as a store with people and furnishings, the parking garage deck would require a roof, as would any other structure to be used for such store purposes, to prevent the passage of water to the concrete deck. Such a roof would include a membrane waterproofing which would be impervious to the passage of water.

63. The poured concrete topping was not supplied by Formigli but by Tribuiani, which was another subcontractor of Foxcroft. Much cracking of the deck was caused by Tribuiani's failure to provide proper curing.

### The Beam At Column Line 44MN

64. The top of a precast beam in the parking garage at column line 44MN which was furnished by Formigli is spalling.

65. The spalling of the beam at column line 44MN and the cracking of the haunch on the column shown in Exhibit P–43 is not caused by any defect in the beam. The length of that precast beam was in accordance with the drawing requirements and industry tolerances. The damage to the column upon which one end of that beam rests is caused by the column being several inches out of position. That column was not furnished by Formigli but was a poured-in-place column furnished by others.

66. The expansion joint above the beam at column line 44MN was not physically located at the place shown on the plans for its location. The incorrect physical placement of the expansion joint was not done by Formigli but by Tribuiani who provided the poured-in-place concrete topping or by Foxcroft itself as general contractor.

67. The incorrect physical placement of the expansion joint above the beam at column line 44MN is the cause of the spalling of that beam and the need for the shoring at that location. It is also a cause of cracking in the surface of the parking garage deck in the vicinity of that beam.

### Alleged Defects in Workmanship

68. According to Partridge, Formigli deviated from good building practice by (a) installing a column on a porch backwards, (b) failing to grout certain precast beam connections, (c) cutting one porch beam in a sloppy manner, (d) failing to complete some welded beam connections, (e) leaving exposed some of the points on the uppermost exterior wall panels at which some metal lifting hooks were burned off, (f) failing to remove debris from holes cut in the Spancrete at the jobsite, and (g) installing a garage column from which some concrete has spalled.

69. There is no evidence that the backward installation of the porch column referred to in paragraph 68(a), above, caused Foxcroft any pecuniary damage or reduced the value of the building in any amount.

70. The cost of grouting the precast beam connections referred to in paragraph 68(b), above, would be approximately $150.

71. The cost of repairing the porch beam referred to in paragraph 68(c), above, would be approximately $50.

72. There is no evidence that the failure to complete some unspecified number of welded connections at unspecified locations referred to in paragraph 68(d), above, caused Foxcroft any pecuniary damage or reduced in any amount the value or affected the soundness of the building.

73. For patching the uppermost exterior panels where some of the lifting hooks were burned off referred to in paragraph 68(e), above, the charge to Foxcroft was less than $105.80.

74. Tribuiani sent Foxcroft a bill for $165 for the removal of the debris resulting from the cutting of holes in the Spancrete by Formigli referred to in paragraph 68(f), above, Foxcroft sent the bill to Formigli for payment. There is no evidence that Foxcroft has paid or even intends to pay Tribuiani. The agreement between the parties does not specify where the holes in Spancrete were to be cut.

75. The spalling of the column referred to in paragraph 68(g), above, did not affect its structural soundness. The cost of its repair would be about $100. There is no evidence of the cause of the spalling.

### The Frozen Beams

76. In January 1968, water froze in the hollow interior of eleven precast box beams furnished by Formigli for the parking garage.

77. The water entered the beams through holes in the top of the beams which were necessary for the manufacturing process.

78. The wind blew the water into the beams after their erection by Formigli.

79. Formigli satisfactorily repaired the frozen beams.

80. Foxcraft paid the following sums which were fair and reasonable for the materials furnished and the work done as a result of water freezing in the beams referred to in paragraph 76, above.

    a. Ambric Testing & Engineering Associates, Inc. $1,995.00 for inspection, testing and consultation with respect to the accumulation of water in beams on the upper level of the parking garage;

    b. Fusion Welding Supply Company $1,400.79 for the rental of salamanders;

    c. J. Pio-Bowman Co. $700.00 for hauling bricks;

    d. Normal Roscilo $525.00 for the rental of forklifts;

    e. Stein Iron Works $243.80 for steel beams and columns.

81. Partridge estimated, at the request of Foxcroft's attorney and for the purpose of this lawsuit that $2,000 was expended to erect a supporting wall under one of the frozen beams, but Partridge does not have the underlying calculations or records which will explain how he arrived at such estimates.

*Tribuiani's Claim*

82. Tribuiani Brothers, Inc. ("Tribuiani"), was the Foxcroft subcontractor who performed all the poured-in-place concrete work at the Benjamin Fox Pavilion.

83. Tribuiani has brought suit against Foxcroft and Formigli in the Common Pleas Court of Philadelphia County, Pennsylvania, as of September Term, 1970, No. 1914. Tribuiani claims $6,426 for the alleged installation of "extra reinforcing steel to extend to the correct length from the precast columns to the wind beams for the street, first, second, third, fourth, fifth, sixth and seventh floors and the roof."

84. Foxcroft has not paid and has denied that it owes Tribuiani the amount claimed by Tribuiani in the lawsuit referred to in paragraph 83, above. Foxcroft has stated its intention not to pay that sum unless there is a judicial determination in that lawsuit of Foxcroft's obligation to make such a payment.

*The Mechanic's Lien Claim*

85. Formigli filed a mechanic's lien claim against Foxcroft Square Pavilion, Inc., in the Court of Common Pleas of Montgomery County, Pennsylvania, on April 14, 1968. The proceeding was voluntarily discontinued by Formigli on March 27, 1969. Legal fees related to the defense of that claim, were stipulated to be $2,744.00.

86. At the time Formigli filed the mechanic's lien claim, Foxcroft had not paid to Formigli the sums invoiced by Formigli under the written agreement. The sums withheld by Foxcroft were far in excess of any amount which was reasonably necessary to satisfy any claim for allegedly incomplete or improper work attributable to Formigli.

*Three Deflected Beams*

87. Accepting the truth that three beams were deflected, there is no competent evidence of the cause of the deflection. Even assuming that the deflection was caused by the premature removal of shoring before the concrete topping was poured above them (and there is no testimony to that), there is no testimony identifying the persons who removed the shoring.

*The Composite Beams*

88. The record does not disclose any evidence to support the assertion by Foxcroft that Formigli designed the so-called composite beams "so that an inordinate amount of concrete was to be furnished by a contractor other than Formigli" or that Formigli's design was a "self-serving and wrongful act".

*Completion and Acceptance of Formigli's Work*

89. Formigli's work at the Foxcroft Pavilion was substantially completed in accordance with the agreement between the parties by March or April, 1967, in

no event later than the submission of Formigli's last invoice on July 31, 1967.

90. Although specified in the terms of the written agreement, the approval of the architect prior to payment to Formigli was neither required by Foxcroft nor obtained by either Foxcroft or Formigli at any time during the performance of the contract.

91. The first request by Foxcroft for approval by the architect prior to payment to Formigli occurred in August 1967 after the meeting referred to in paragraph 30, above. Following that meeting Fox wrote a letter to Stoelker dated August 11, 1967, in which he stated "With respect to your request for payment at this time, Mr. Idell is going to make an inspection of the building and determine the work remaining to be done . . . ." Formigli never received any report of such inspection by Idell. There is no evidence that there ever was such an inspection by Idell.

92. Foxcroft has included the full amount of Formigli's billings for its work in determining the total cost of the building and that total cost has been used as a base for depreciation in preparing tax returns and other statements. The building has been substantially occupied by tenants for a number of years: For the year 1970, the Benjamin Fox Pavilion was 99% or 100% occupied by tenants. For January 1971, the occupancy was 98%, and for February and March 1971, the occupancy rate was 99%.

*The Balance Owed Formigli*

93. The balance owed Formigli by Foxcroft before the addition of interest is $278,337.72 and is determined as follows:

| | | |
|---|---:|---:|
| Original contract price --------------------------------$1,459,000.00 | | |
| Add net increase for changes in the scope of the work (paragraph 26, above) | | 15,647.60 |
| | | 1,474,647.60 |
| Less (paragraph 23): | | |
| Payments on account | $1,160,254.88 | |
| Credit | 540.61 | 1,160,795.49 |
| | | 313,852.11 |
| Less set-offs for: | | |
| Incomplete work (paragraph 30, above) | 5,600.00 | |
| Exterior wall panels (paragraph 42, above) | 20,000.00 | |
| Defects (paragraphs 70, 71, and 72, above) | 305.80 | |
| Frozen beams (paragraphs 80 and 81, above) | 6,864.59 | |
| Counsel Fees (paragraph 85, above) | 2,744.00 | 35,514.39 |
| Balance owed Formigli | | $ 278,337.72 |

94. Of the balance owed Formigli, $152,304.51 was due and payable upon the submission of Formigli's invoice dated July 31, 1967. The retainage provided for in the agreement between the parties was more than enough to protect

Foxcroft against loss from incomplete or defective performance by Formigli. The balance was due 120 days after July 31, 1967, or on November 28, 1967.

*Interest*

95. At all times since August, 1968, Formigli has had long-term borrowings in amounts in excess of $2,300,000 at interest rates varying from a minimum of 7.25% to a maximum of 11.39% per annum. The average interest rate over this period has been 7.8%.

96. Foxcroft Square Pavilion, Inc., a corporation in which the individual defendants are the sole shareholders, borrowed $725,000 from Westinghouse Credit Corporation on or about August 16, 1968, at an annual interest rate of 12½%. The loan was secured by a mortgage on real estate of Foxcroft Building Corporation and Benson Apartment Corporation, of which the individual defendants are also the sole shareholders.

## DISCUSSION

*The Contract And The Nature Of The Dispute Between The Parties*

This is a suit on a contract between Formigli Corporation ("Formigli") and William L. Fox, Irwin C. Fox, Dorothy Kotin, and Foxcroft Square Company, the partnership of which the individual defendants are partners. (William L. Fox is referred to as "Fox" and all of the defendants are collectively "Foxcroft".) Foxcroft was the general contractor and Formigli was one of Foxcroft's subcontractors in the construction of a multi-story building in Abington Township, Pennsylvania, known as the Benjamin Fox Pavilion.

Jurisdiction is based upon diversity of citizenship and the jurisdictional requirements have been met.

Formigli entered into a written agreement with Foxcroft dated June 21, 1965 in which Formigli agreed, among other things, to furnish certain labor and materials, including all precast concrete work, for the Benjamin Fox Pavilion for a price of $1,459,000 ("the written agree-

ment"). Substantially all the precast concrete elements for the Benjamin Fox Pavilion were fabricated by Formigli and delivered to a jobsite where they were erected by Berry-Baschoff, Inc., a subsidiary of Formigli.

The agreement dated June 21, 1962 provided that Formigli would be paid 90% of the value of work as the work progressed and the remaining 10% 120 days after completion of the work and acceptance by the architect. Between October 29, 1965 and July 31, 1967, Formigli submitted invoices to Foxcroft for work performed under the agreement which totaled $1,459,000.00. Between February 4, 1966 and June 7, 1967, Foxcroft made payments totaling $1,160,-254.88. In addition, Formigli credited Foxcroft's account in the amount of $541.61 on April 19, 1966.

From the submission of the Formigli invoice on or about January 31, 1967, there were substantial amounts in excess of the retainage remaining unpaid by Foxcroft. As of July 31, 1967 the outstanding balance invoiced by Formigli remaining unpaid by Foxcroft was $298,204.51. Of that sum, $152,304.51 was then due and payable and the remainder was retainage held by Foxcroft pursuant to the written agreement. Repeated demands for the payment of the sums due Formigli were made without success.

Since August 1967 there have been disputes between Formigli and Foxcroft about the amount of the net adjustment to be made to the price provided in the written agreement for changes in the scope of the work contemplated by that agreement and Foxcroft has claimed set-offs against the balance of the contract price that would otherwise be due Formigli.

The set-offs claims by Foxcroft arise out of the following:

a. Incomplete work.

b. The condition of the exterior wall panels for the building tower.

c. The caulking of the joints between exterior wall panels.

d. The condition of the parking garage deck.

e. The spalling of a beam in the parking garage at column line 44MN.

f. Alleged defective workmanship of Formigli.

g. The freezing of water in certain parking garage beams.

h. The assertion of a claim against Foxcroft and Formigli by Tribuiani.

i. The filing by Formigli of a mechanic's lien against Foxcroft Square Pavilion, Inc.

j. Three deflected beams.

k: Improper design of the composite beams.

Foxcroft also asserts as a defense the failure of George S. Idell, Foxcroft's architect, formally to accept Formigli's work.

Formigli contends that it is entitled to damages for Foxcroft's unreasonable retention of sums to which Formigli was entitled. Formigli further contends that such damages should be measured at the rate of 7.8% per annum to fairly compensate it for its loss in this respect.

*Adjustments In The Contract Price For Changes In the Scope Of The Work*

The written agreement provided:

"There shall be no extra charges to complete work called for under this contract. However, the party of the first part (Foxcroft), without invalidating the Contract, may order extra work or make changes by altering, adding to, or deducting from the work, the Contract Sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract."

Formigli listed its claims for price adjustments attributable to changes in the work in a letter to Foxcroft dated August 30, 1967.

The Final Pretrial Order ("FPTO") narrowed the disputes about the adjustments to be made in the contract price for changes. Sub-paragraphs 15(a) and 15(b) of the Final Pre-Trial Order provided:

"a. Items which have not been in dispute, when set off, result in a net decrease in the contract price of $27,-921.00.

"b. To narrow the issues to be tried the parties have agreed to compromise certain items which, when set off, result in an increase in the contract price of $21,359.60."

This leaves remaining for decision by the Court Formigli's claims for increases in the contract price referred to in items 3B, 4, 5 and 13B of Exhibit P-3. (FPTO, ¶ 14(c).) Items 3B, 4 and 5 arise from Formigli's furnishing additional and more costly materials than originally contemplated by the written agreement.

Item 3B is $3,296 for four additional beams and columns furnished by Formigli to fill a void resulting from the elimination of a circular ramp at the perimeter of the parking garage.

Item 4 is $10,599 for the substitution of a more costly and greater area of "dish-shaped" exterior wall panels for so-called "channel-shaped" wall panels on three areas of the office tower.

Item 5 is $6,814 for increased area of exterior wall panels and increased beam length attributable to the relocation of two exterior fire towers.

Item 13B is $1,500 to reimburse Formigli for an additional fee charged by Speyer for additional design work resulting from changes made in the location and shape of the building by Idell.

The record establishes Formigli's entitlement to these increases in the contract price.

*Tribuiani's Claim*

■ Tribuiani has sued Foxcroft and Formigli in the state court for $6,426 for the alleged installation of extra steel. Foxcroft has not paid and denies it owes Tribuiani for that work. Foxcroft has stated its intention not to pay until the state court determines that Foxcroft is obligated to make the payment.

Assuming the correctness of Foxcroft's contention that it doesn't owe the

money to Tribuiani coupled with the fact that it intends to pay Tribuiani nothing, it is not entitled to any windfall set-off.

### The Mechanic's Lien Claim

It has been stipulated that Formigli filed a mechanic's lien claim against Foxcroft Square Pavilion, Inc., on April 4, 1968, and that the lien claim was voluntarily discontinued on March 27, 1969, also it was stipulated that the law firm of White and Williams was paid $2,744 for services and expenses in connection with the claim.

In the written agreement the parties agreed that "no mechanics' liens, encumbrances, or any claim in the nature thereof shall be filed by it, the party of the second part (Formigli)".

The evidence also shows that, at the time Formigli filed the mechanic's lien claim, Foxcroft had not paid to Formigli the sums invoiced by Formigli.

■ It is clear that the right to file a mechanic's lien may be waived by agreement. The law of Pennsylvania contemplates that there will be waivers. 49 P.S. § 1401; Clayton v. Lienhard, 312 Pa. 433, 167 A. 321 (1933). The lien of the contractor comes into play only upon the owner's breach of the contract, for if the owner pays the contractor what falls due from time to time, the lien is unimportant. The waiver of the lien means that in case the owner fails to pay, the contractor will assert no lien on the property but will rely upon the owner's general credit.

■ In this case the agreement contains an express waiver of the right of Formigli to file a mechanic's lien. The validity of that waiver is not affected by Foxcroft's breach of contract. Bendik v. Uniontown S. R. Co., 408 Pa. 66, 182 A.2d 512 (1962). Although he has lost his lien, the contractor can sue the owner at law for the money due him.

■ Formigli breached the contract when they filed a mechanic's lien claim against Foxcroft Square Pavilion, Inc., on April 4, 1968. Foxcroft is entitled to set-off of $2,744.00 for legal services and expenses in connection with that claim.

### Formigli's Substantial Performance

■ A party's right to recover for incomplete but substantial performance under a contract was settled long ago in Pennsylvania. In 1850, the Supreme Court of Pennsylvania affirmed a verdict in favor of a bridge builder for the balance of the contract price, less a set-off for incomplete work. Danville Bridge Company v. Pomeroy and Colony, 15 Pa. 151 (1850). In that decision the Court found the controlling principles in even earlier cases and summarized them as follows (15 Pa. at 159):

> " * * * Each of them [referring to earlier cases] proceeds upon the ground that, where a party, acting honestly, and intending to fulfill his contract, performs it substantially but fails in some comparatively unimportant particulars, the other party will not be permitted to enjoy the fruits of such imperfect performance, without paying a fair compensation according to the contract, receiving a credit for any loss or inconvenience suffered. And, perhaps, it may be asserted, that where a thing is so far perfected as to answer the intended purpose, and it is taken possession of and turned to that purpose by the party for whom it is constructed, no more imperfection or omission, which does not virtually affect its usefulness, can be interposed to prevent a recovery, subject to a deduction for damages, consequest upon the imperfection complained of. * * *"

The Danville case has been followed in many subsequent Pennsylvania decisions. E. g., Pressy v. McCormack, 235 Pa. 443, 84 A. 427 (1912); Smith v. Cunningham Piano Co., 239 Pa. 496, 86 A. 1067 (1913); Otis Elevator Co. v. Flanders Realty Co., 244 Pa. 186, 90 A. 624 (1914); See also Sgarlat v. Griffith, 349 Pa. 42, 36 A.2d 330 (1944); Schlein v. Gross, 186 Pa.Super. 618, 142 A.2d 329 (1958); Exton Drive-In, Inc. v. Home Indemnity Co., 436 Pa. 480, 261

A.2d 319 (1969), cert. denied, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970).

More recently the principles relating to the right to recover for substantial performance were summarized in the Restatement of Contracts at Sections 274(a) and 275, as follows:

" § 274.   FAILURE   OF   CONSIDERATION   AS   A   DISCHARGE OF DUTY.

"(1) In promises for an agreed exchange, any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional. An Immaterial failure does not operate as such a discharge."

" § 275.   RULES FOR DETERMINING MATERIALITY OF A FAILURE TO PERFORM.

"In determining the materiality of a failure fully to perform a promise the following circumstances are influential:

(a) The extend to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

(b) The extend to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The wilful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract."

These Restatement sections have been adopted and followed by the Pennsyl-vania appellate courts. *E. g.*, Sgarlat v. Griffith, supra; Schlein v. Gross, supra; Windber Trust Co. v. Evans, 192 Pa.Super. 417, 161 A.2d 664 (1960).

■ Applying the guidelines set forth in Section 275 the following analysis is appropriate:

"(a) *The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated.*"

The objective of the entire project was to build a store and office building for lease to tenants. That objective has been achieved with extraordinary success. It was stipulated that the building has been substantially occupied for a number of years with the exception of January, 1971, the occupancy rate for the period from January 1970 to March 1971, was 99% or 100%, and for January, 1971, was 98%.

"(b) *The extend to which the injured party may be adequately compensated in damages.*"

The facts with respect to damages have been set forth. Foxcroft may be adequately compensated for the damages it has sustained which are the incomplete work ($5,600.00), the exterior wall panels ($20,000.00), the trivial defects ($305.80), the expenditure relating to the frozen beams ($6,864.59), the legal fees paid to defend filing of mechanic's lien ($2,744.00). These damages have been summarized in paragraph 93 of the Court's Findings of Fact.

"(c) *The extent to which the party failing to perform has already partly performed or made preparations for performance.*"

A fair measure of the magnitude of Formigli's work is the contract price, which originally was $1,459,000. Adjustments for changes in the work will increase that price by $15,647.60 to $1,-474,647.60. The work left incomplete by Formigli had a price of $5,600 or less than 0.4% of the adjusted contract price. The principal defect was the condition of the exterior panels for which the estimated cost of repair was $15,000 to

$20,000, or little more than 1% of the value of the entire work. In January, 1968, the frozen beams gave rise to about $6,800 in Foxcroft expense. Thus, the aggregate of all of these things, less than $33,000, was only a little more than 2% of the adjusted contract price of approximately $1,474,000.

"(d) *The greater or less hardship on the party failing to perform in terminating the contract.*"

In this case the person failing to perform had almost, but not quite, entirely completed his work. Thus, the loss by Formigli of hundreds of thousands of dollars to which it otherwise would be entitled is to be balanced against awarding Foxcroft a set-off for omissions and deficiencies having a value of less than $33,000.

"(e) *The wilful, negligent or innocent behavior of the party failing to perform.*"

Formigli did intentionally refuse to continue its work and correct deficiencies in its work. But as noted above, the incomplete work was insignificant. There was evidence from which it could be found that the condition of the exterior wall panels was not Formigli's fault and the other alleged defects were trivial. The frozen beams and mechanic's lien disputes had not yet arisen. Moreover, Formigli's refusal was clearly justified in the circumstances where Foxcroft had for many months withheld substantial sums payable to Formigli under its contract and promised to bring its account current at the August 8, 1967 Stoelker/Fox meeting and then refused to do so pending an inspection by Foxcroft's architect, an inspection which was never held.

"(f) *The greater or less certainty that the party failing to perform will perform the remainder of the contract.*"

This factor has no application to the case at bar since there is no further performance expected from Formigli.

In August of 1967, Formigli was entitled to receive and Foxcroft had refused to pay more than $152,000 in excess of the retainage of $145,900 as provided in the written agreement. Substantial amounts of money had been owed since January 31, 1967, and Formigli had had no success in collecting the amounts by which the billings exceeded the retainage despite repeated requests and demands for payments. At the August 8, 1967 meeting, Fox had promised Stoelker a payment would be made and then he broke that promise. Faced with this situation, Formigli was justified in refusing to continue to underwrite Foxcroft's building program and to complete the work. East Cross Roads Center, Inc. v. Mellon-Stuart Co., 416 Pa. 229, 205 A.2d 865 (1965); United States Fidelity & Guaranty Co. v. Robert Grace Contracting Co., 263 F. 283 (3rd Cir. 1920); Worden v. Connell, 196 Pa. 281, 46 A. 298 (1900); Turner Concrete Steel Co. v. Chester Construction & Contracting Co., 271 Pa. 205, 114 A. 780 (1921).

*The Absence Of The Architect's Approval Does Not Preclude Recovery*

Under the terms of the written agreement, sums payable under the contract would be paid as follows:

"90% to be paid from time to time as the work processes on approval of building architect. 10% to be paid 120 days after completion of the work done under this contract and acceptance by the building architect." (Exhibit P-1, page 2)

It is clear that this provision was intended as a protection to Foxcroft by Formigli and to insure that Formigli properly performed its agreement. However, equally clear is the principal of law that one may waive any provision in the contract which has been established for his benefit. Mayer Brothers Construction Co. v. American Sterilizer Co., 258 Pa. 217, 101 A. 1002 (1917); McKenna v. Vernon, 258 Pa. 18, 101 A. 919 (1917).

In *McKenna*, the plaintiff agreed to erect a theatre for the sum of $7,750 to be paid by the owner upon certificates of the architect as follows: "Eighty per

cent. of the work set in place as the work proceeds, the first payment within 30 days after the completion of the work; all payments to be due when certificates of the same shall have been issued by the architect. * * * " 258 Pa. at 18, 20, 101 A. at 919. The owner made seven payments as the work progressed amounting to $6,000. Suit was brought to recover the balance with interest and defendants answered alleging failure of the plaintiff to erect and complete the building in accordance to the plans and specifications and inferior workmanship throughout which would require large expenditures to correct. The trial resulted in a verdict for the plaintiff, and on appeal, defendant raised several assignments of error based on the theory that the failure to produce an architect's certificate of final completion of the building barred the plaintiff's cause of action.

On the point the Court said at pages 21–22, 101 A. at p. 920:

" * * * Not only is there no express provision to this effect in the contract, but the contract itself shows that no distinction is there made between final payment and the payments on account of the 80 per cent of work in place. All payments were to be made only on certificate of the architect, and yet with a single exception each of the seven payments made as the work progressed was made without a certificate being asked for. With such constant and repeated disregard on the part of the owner to exact compliance with this provision in the contract, it is too late now for him to insist that failure on the part of the plaintiff to secure such certificate before suit defeats his right of action. * * * The provision in the contract for written certificates from the architect is for the benefit and protection of the owner. If he waived it repeatedly, as he did here, during the progress of the work, he cannot complain if he be held to have waived it when he seeks to defend against a final payment for work shown to have been honestly and substantially per-formed, especially when almost daily he has had the work under his own observation, without remonstrance or complaint at any time with respect to either the work done or materials employed * * *."

■ In the case before this Court, Foxcroft made 12 payments totaling $1,160,254.88 on account of invoices submitted by Formigli and neither asked for nor received approval of the architect to the effect that these payments were due. Such a series of acts provides overwhelming evidence of an intention on the part of defendants to waive this right established for their benefit. Since they chose to disregard compliance with this provision in so many instances during the progress of the work, defendants cannot invoke it now or complain when they are prevented from doing so when defending a claim for final payment for work which was substantially and honestly done in compliance with the contract. See also, John Conti Co. v. Donovan, 358 Pa. 566, 57 A.2d 872 (1948).

### Interest

Formigli contends that it is entitled to damages for Foxcroft's unreasonable retention of money due them under the contract. They further contend that such damages should be measured at the rate of 7.8% per annum to fairly compensate it for its loss in this respect.

Formigli urges this court to take judicial notice of the money market from August of 1967 and thereby recognize that for the majority of this period the prime interest rate charged by banks to their most creditworthy customers had been in excess of 6% per annum. Formigli presented testimony which indicates that during the same period they paid an average interest rate of 7.8% per annum, and that Foxcroft Square Pavilion, Inc., a corporation of which the three individual defendants were the sole shareholders, paid interest at a rate of 12.5% per annum on a loan obtained in August of 1968.

■ This court will not take judicial notice, *ex parte*, of the money market during the period in dispute. Even assuming that the court could take notice of this fact without requiring proof thereof and that it was a proper item of damage, the defendants should have had an opportunity to present its arguments against taking judicial notice.

■ This court does not believe that the cases cited by plaintiff represent the law of Pennsylvania on this issue.[1] When money is due a person under a contract but is improperly withheld or unpaid by the defendant, the party to whom such money is due is entitled to interest from the time it was due, at 6% per annum.

■ Barium Steel Corp. v. Wiley, 379 Pa. 38, 108 A.2d 336 (1954); Palmgreen v. Palmer's Garage, 383 Pa. 105, 117 A.2d 721 (1955); Restatement of Contracts § 337, 41 P.S. § 3. In the absence of express contract, simple interest at the statutory legal rate is recoverable as damages for breach of contract. Palmgreen v. Palmer's Garage, supra.

## CONCLUSIONS OF LAW

A. This Court has jurisdiction over the parties and the subject matter of the action. 28 U.S.C. § 1332.

B. Formigli substantially performed its agreement with Foxcroft and is entitled to recover thereon.

C. Considering the nature and magnitude of all of the work called for under the agreement, the omissions and defects in Formigli's performance were insubstantial and due allowance may be made to Foxcroft for such omissions and defects by adjustments in the sum otherwise owed to Formigli under the agreement.

■ D. Formigli's refusal in August 1967 to complete the work and correct the defects in its work was justified by Foxcroft's failure to pay within a reasonable time the substantial amounts in excess of the retainage that had been due and payable to Formigli since February 1967.

E. Formigli was entitled to the balances set forth as due on the dates set forth in paragraph 24, above, and to $278,337.72 on November 28, 1967. The latter amount reflects fair and reasonable credits to Foxcroft for work required by the agreement which was unperformed or uncorrected by Formigli when it stopped work in August 1967.

F. Foxcroft waived any provision of the written agreement which conditioned payment to Formigli upon approval or acceptance of Formigli's work by Foxcroft's architect.

G. Notwithstanding the absence of formal approval or acceptance by Foxcroft's architect, Foxcroft accepted and enjoyed the benefits of Formigli's work.

H. Formigli is entitled to interest on the sums due and payable to Formigli. To fairly compensate Formigli for its loss of use of these sums, simple interest shall be allowed at the rate of 6% per annum.

---

1. The plaintiff relies upon In re Kenin's Trust Estate, 343 Pa. 549, 23 A.2d 837 (1942). This case merely stands for the proposition that a court will not award interest at the legal rate of 6% when the prevailing rates are less. This is to avoid a windfall recovery by the prevailing party. In our search we have found no Pennsylvania case where recovery was permitted for interest at a higher rate than 6%. Although it may be fair and equitable to do so, this does not appear to be the law of Pennsylvania to which we are bound.