## Allen, Appellant, *v.* Mitten Bank Securities Corporation.

Argued October 26, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Cecil P. Harvey*, with him *William Horenstein*, of *Horenstein & Harvey*, for appellant.

*George Henry Huft*, for appellee.

OPINION BY RHODES, J., December 17, 1937:

This is an appeal by plaintiff from the refusal of the court below to take off a nonsuit. On February 16, 1928, plaintiff subscribed for 20 shares of Mitten Bank Securities Corporation preferred stock, at $25 per share, paid defendant the sum of $500, and received a certificate therefor. On August 2, 1928, plaintiff subscribed for 20 additional shares of the same stock, for which she paid defendant the sum of $500, and received a certificate. On December 10, 1934, she instituted an action in assumpsit against defendant for the amount of the purchase price of the 40 shares of stock, less the sum of $10, claiming interest thereon from November 25, 1929. The material portions of plaintiff's statement,[1] defendant's affidavit of defense containing new

---

[1] "6. The plaintiff was induced to subscribe to and purchase the aforesaid stock upon the representations made by the defendant, appearing in circulars, a true and correct copy of which representation is as follows:

"READY MARKET

"Until MBSC is listed on the stock exchange or until further notice, a market for the purchase and sale of MBSC is maintained at Mitten Bank, Broad and Locust Streets, and· at all other Mitten Bank Locations. Should you be forced to sell, you will receive $25 per share, par value. There is a charge of 25c per share to cover the cost of this service.

"7. That the representations made on the said printed circulars were widely advertised and posted in street cars, taxicabs and newspapers in the City of Philadelphia in order to induce individuals to purchase the stock of MBSC.

"8. Plaintiff avers that she was induced to subscribe to and purchase the aforesaid stock specifically by reason of the provision set forth in paragraph 6 herein.

matter,[2] and plaintiff's reply to new matter[3] are quoted

"9.   Plaintiff avers that on or about November 25, 1929, before receiving any notice and before MBSC was listed on the stock exchange, she called at the Mitten Bank, Broad and Locust Streets, Philadelphia, and demanded of the proper official, agent and representative of the defendant, whose name is unknown to the plaintiff, Twenty-five Dollars ($25.00) per share for each of her forty (40) shares as aforesaid, less twenty-five (25) cents per share, or the sum of Nine Hundred Ninety Dollars ($990.00), in accordance with the representations as are set forth in paragraph 6 herein, leaving said certificates with the defendant.

"10.   Plaintiff avers that on or about December 6, 1929, the defendant returned to her certificate PO31117 and certificate PO57553, the latter certificate being in substitution of plaintiff's original certificate.

"11.   Plaintiff avers that immediately after, to wit: December 6, 1929, prior to any notice and before MBSC was listed on the stock exchange, she called at Mitten Bank, Broad and Locust Streets, Philadelphia, and demanded Twenty-five Dollars ($25.00) per share for her forty (40) shares, less twenty-five (25) cents per share, or the sum of Nine Hundred Ninety Dollars ($990.00), but that the defendant, by its servants, agents and representatives, whose names are unknown to the plaintiff, refused to pay the said sum of Nine Hundred Ninety Dollars ($990.00).

"12.   Plaintiff avers that she has demanded the sum of Nine Hundred Ninety Dollars ($990.00) of the defendant, but the defendant continued and continues to refuse to pay the same in accordance with the representation set forth in paragraph 6 herein.

"13.   Plaintiff avers that at all times since November 25, 1929, she has been ready, willing and able to deliver the said certificates upon payment of the sum of Nine Hundred Ninety Dollars ($990.00), and that she now holds the said certificates at the disposal of the defendant upon such payment."

[2] "15.   That the preferred stock of defendant was listed on the Philadelphia Stock Exchange on December 19, 1929, and that there has been a daily market available for the sale of said stock on said stock exchange since ten o'clock a. m. on that day.

"16.   From December 19, 1929, to December 24, 1929, the preferred stock of defendant sold on the Philadelphia Stock Exchange at Twenty-five Dollars ($25.00) or better per share. From December 24, 1929, to date, the price at which the preferred stock of defendant has sold on said stock exchange has ranged from

in footnotes. The record shows the admission by defendant of the facts averred in paragraph 7 of plaintiff's statement, and that it advertised the representation quoted in paragraph 6.

It appears that the certificate purchased on February 16, 1928, was in the name of May Allen, and that purchased on August 2, 1928, was in the name of Alvina Allen, the plaintiff. Plaintiff testified that on November 25, 1929, she took the certificate for the first 20 shares of stock in the name of May Allen to the Mitten Bank at Broad and Locust Streets, Philadelphia, and went to the balcony where she had originally bought them, and saw "a girl in the office"; that she demanded her money, signed for the certificate, and left it there. On the 5th or 6th of December, she received a new certificate in the name of Alvina Allen, which was in substitution of the one surrendered previously in the name of May Allen. On December 6, 1929, at 10 a. m., plaintiff took this certificate and the one representing the stock purchased in August, 1928, to the bank, and "spoke to an office girl" whom she had seen on her visit there November 25th. She testified that the girl "was tall, slender, and a blond, about 35 years old," but that she did not know her name. Plaintiff produced the two stock certificates, and said that she had not asked for a new certificate [on November 25th]. Her testimony continued as follows: "I asked for $495.00. She said—

Twenty-five Dollars ($25.00) per share to Sixty-two and one-half cents (62½c) per share."

[3] "15. It is admitted that the stock was listed on the Philadelphia Stock Exchange on December 19, 1929, but it is denied that the plaintiff was required to sell her stock on the stock exchange. Plaintiff avers that at all times since November 25, 1929, she has retained the said stock as the property of and subject to the demand of Mitten Bank Securities Corporation.

"16. Admitted, with the qualification that there was no obligation upon the plaintiff to sell the stock upon the stock exchange, and further that the prices quoted on the stock exchange did not represent the value of the stock."

She looked at the two certificates and she went back to the office and said 'I will speak to Mr. Brown.' She came back with a slip of paper and she said 'All right, you come back in thirty days' which was on the 6th of January, 1930. When I went back— Q. What did you say when she said 'come back in thirty days'— ...... A. Well, I said 'Will I get my money back this time?' She said 'Yes.' She looked at the two and took them back to the office. She came back and said 'You hold them and come back on the 6th of January, 1930.' So then I went back on the 6th of January, 1930. Q. Where did you go, the same place? A. Yes. Q. Whom did you speak to? A. I spoke to the very same girl. Q. What did you say and what did she say? ...... The witness: The third time I went to her I had the two certificates and she said 'I am sorry, but the stock is listed on the Stock Exchange and I can't do anything for you.' I gave her an argument. I told her 'I am working very hard for a living and I have to carry out my orders.' ...... Q. Have you ever received your money? A. No, sir. Q. Have you ever withdrawn your demand for the money. A. No, sir."

It also appears from plaintiff's testimony that she accepted three dividends on the forty shares of stock, subsequent to her alleged demands; that she did not know whom to consult about her case until she was recommended to her present counsel in 1932; and that the press of other business prevented suit being brought until 1934.

At the close of plaintiff's case, the court below granted a compulsory nonsuit which it later refused to take off. Plaintiff then appealed.

On this appeal we must view the evidence in the light most favorable to plaintiff, assuming the truth of the evidence and giving plaintiff the benefit of all inferences fairly deducible therefrom, and resolve all doubts in favor of a trial. *Malone v. Marano*, 326 Pa.

316, 192 A. 254, and *Bahas v. Equitable Life Assurance Society of United States,* 128 Pa. Superior Ct. 167, 193 A. 344.

We affirm the action of the court below, but we do not rest our conclusion on the reason which it has assigned in its opinion for its action. From an examination of the pleadings and of the evidence, it will be observed that there is an absence of any averment or proof of damages sustained by plaintiff. Whether plaintiff is entitled to recover the purchase price of her stock depends, in part, upon what remedy she has pursued, and, in part, upon the interpretation to be given the agreement relied upon.

It is clear that plaintiff's remedy must be based upon either an affirmance or rescission of the contract. In the former, plaintiff elects to keep what she has received by virtue of the contract, and sues to recover the damages sustained by the alleged breach (the price having been paid by plaintiff). In the latter, plaintiff returns or tenders a return of what she has received under the contract, and demands a return of the entire consideration given by her.

It follows that, if plaintiff proceeded on the theory that she had rescinded the contract upon defendant's failure to perform, she would be relieved of the necessity of showing damage, because, under those circumstances, she would be entitled to the return of all she had paid, and the question of damages would not arise. An examination of the plaintiff's statement and of the testimony conclusively shows that, assuming she would have been justified in so doing, plaintiff never attempted to rescind the contract in question. Every demand alleged was in reliance upon the contract, and it is nowhere either averred or proved that she elected to rescind when her alleged demands for the purchase or sale of her stock were not complied with. In this connection it is significant that plaintiff's suit is

brought for $990, which is the amount she paid defendant less the service charge of 25 cents per share, a total of $10, an item for which no deduction should be made if her theory is that her contract with defendant was rescinded. If it be argued that the bringing of suit constituted notice of rescission, it came too late. Plaintiff's summons in assumpsit did not issue until December 10, 1934, five years after the events giving rise to this action took place. When this question arose during the cross-examination of plaintiff in the court below, the trial judge remarked that as long as suit had been brought within the statutory period it was immaterial. This would be true if the action was one for damages for breach of contract; but where the plaintiff proceeds on the theory of rescission, delay for an unreasonable time in making known her election is fatal. See *Leaming et al. v. Wise et al.,* 73 Pa. 173.

In the absence of a rescission—and we are of the opinion there was none—plaintiff's action must be based on an affirmance of the contract, and, therefore, for damages due to defendant's alleged failure to perform; and the meaning of defendant's undertaking consequently becomes of primary importance. Construing the advertisement most strongly against defendant, it is evident that defendant nowhere agrees to purchase specific shares of stock, or stock generally. Giving the broadest construction to the words, it was to the effect that a market would be maintained at the Mitten Bank, Broad and Locust Streets, and at other Mitten Bank locations, and that sellers would receive $25 per share, less a service charge of 25 cents per share. The advertisement does not expressly state who is to pay the $25 per share, nor is it an unavoidable inference that defendant was to pay it. Consequently, the proposition is reduced to one whereby defendant assured prospective buyers of its stock that a market would be maintained at a fixed price until the stock was listed on

the exchange. With this plaintiff apparently agrees. In plaintiff's brief it is said: "It will be noticed that the representation is that *a market will be maintained at Mitten Bank.* It does not state who will maintain the market, or who will purchase the stock, whether the Mitten Bank Securities Corporation, or the Mitten Bank, or a third party or third parties. ...... Either a market was maintained by some one at the Mitten Bank, or it was not. If it was not, the defendant is liable for breach on contract."

If that is the true extent of defendant's obligation, and assuming that it was breached, what then is the measure of plaintiff's damages? In 14 Corpus Juris p. 715, the rule applicable, where the action is one for the breach of contract to purchase stock, is stated as follows: "The general rule as to the measure of damages, where the buyer repudiates the contract and refuses to receive and accept the stock, is the difference between the contract price and the market value of the stock at the time and place of delivery, and where the seller, after the stock has been tendered and refused, assumes to be the owner thereof, he can recover only such difference; but the fact that the seller afterward recoups himself by making advantageous sales of the stock does not lessen or alter the liability of the purchaser. Where, however, the sale is not one of a general character, but is a sale by which the seller is to be paid a specified sum for specific stock, a transfer of which he tenders to the buyer, the measure of damages for the buyer's refusal to take such stock is the contract price, and not the difference between such price and the value of the stock at the time of the alleged breach of contract." Our decisions are in accord with these rules. See *Reynolds v. Callender,* 19 Pa. Superior Ct. 610; *Vilsack v. Wilson,* 269 Pa. 77, 112 A. 17; *Alexander v. Soulas,* 269 Pa. 423, 112 A. 538. See, also, *Unexcelled Fire-Works Co. v. Polites,* 130 Pa. 536, 546, 18 A. 1058.

Recovery of the price has been permitted where it was shown that the stock was worthless or unsalable. *Flannery v. Wessels,* 244 Pa. 321, 90 A. 715; *Mobley et al., Ex'rs, v. Morgan,* 8 Sadler 105, 6 A. 694. But it seems also that the contracts in those cases contemplated specific shares of stock.

There is no evidence that the stock held by plaintiff was worthless, or unsalable generally before or after December 19, 1929. None of the foregoing rules is applicable here, as the representation upon which plaintiff relies was, we think, nothing more than one to maintain a market at a given price until the listing of the stock on the exchange. An examination of the cases in which the foregoing rules have been applied discloses that, in every one which has come to our attention, with one exception, the agreement involved the purchase or repurchase of stock by the party sought to be charged with the breach. A contrary result was reached in *Mitten Bank Securities Corporation v. Huber, Same v. Jordan* (C. C. A.) 74 F. (2d) 299, actions against defendant corporation in the case at bar involving similar material facts, where verdicts for plaintiffs were sustained. On petition for rehearing, after quoting the above rule from Corpus Juris, the court said, at page 300: "It seems to us that whether they agreed to repurchase or to maintain a market for any stock which might be tendered is immaterial, for in either case the defendant represented that the seller 'will receive $25.00 per share, par value,' less 25 cents per share to cover the cost of service. The defendant was duty bound either to repurchase the stock or to see that it was resold for the dissatisfied owner at the stipulated amount per share. It did neither.

"As to the measure of damages it seems to us that in the agreement between plaintiffs and defendant, the defendant undertook to guarantee that the seller would receive $25, less 25 cents per share for the stock.

"The measure of damages for the refusal was the contract price which the defendant agreed that the seller should receive and the judgments entered represented this amount plus interest. This agreement comes under the second part of the rule stated above upon which the defendant relies. It was on the basis of this agreement that the judgments were entered below, and the rehearing is accordingly denied."

The court proceeds on the assumption that it is immaterial whether defendant agreed to repurchase the stock or whether it agreed to maintain a market for any stock which might be tendered, and then applies the measure of damages laid down for the breach of contract to purchase specific stock. In arriving at its conclusion, the court also states that "defendant undertook to guarantee that the seller would receive $25, less 25 cents per share for the stock."

"Guaranty," as applied to the undertaking of defendant in the instant case, would be a misnomer. "Guaranty is distinguished from warranty, although they have many corresponding features. They are both collateral contracts. But guaranty is an undertaking to answer for another's liability, while warranty is an undertaking that a certain fact regarding the subject of the contract is what it has been represented to be, and relates to some agreement made ordinarily by the party who makes the warranty. *Commonwealth Cotton Oil Co. v. Lester,* 9 P. (2d) 738, 745, 156 Okl. 93": 3 Words & Phrases (Fourth Series) 836, 837. See, also, 28 Corpus Juris §10, p. 894; 24 R. C. L. §425, p. 153; *Pacific Power & Light Co. v. White et al.,* 96 Wash. 18, 164 P. 602. Defendant's undertaking here was a warranty. The nature of defendant's obligation cannot be considered "immaterial." This is a determining factor in the case at bar. Were it a plain agreement to repurchase, it would approach more closely the limits of the rule to which allusion has been made. Our interpreta-

tion of defendant's undertaking is that it was an assurance of a market at a certain price until the listing of the stock. As a consequence, plaintiff was entitled only to such loss as she may have suffered by the failure on the part of defendant to do just that thing. It was incumbent upon plaintiff to produce evidence pertinent to the damages she has sustained; for want of such evidence a nonsuit was proper. See *Wasserman v. Fleisher,* 249 Pa. 29, 94 A. 454.

Judgment is affirmed.