**AMERICAN ELECTRONICS LABORA-
TORIES, INC., Plaintiff,**

**v.**

**Paul S. DOPP, Defendant.**

**Civ. A. No. 4078.**

United States District Court,
D. Delaware.

Jan. 2, 1974.

Lewis S. Black, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff.

Irving Morris of Cohen, Morris & Rosenthal, Wilmington, Del. and Charles Haydon of Dublirer, Haydon & Straci, New York City, of counsel, for defendant.

## OPINION AND FINAL JUDGMENT

LATCHUM, Chief Judge.

In this case, American Electronic Laboratories, Inc., ("AEL"), a Pennsylvania corporation, sued to recover a judgment in the amount of $1,510,950 from Paul

S. Dopp ("Dopp"), a New Jersey citizen, for breach of contract. The complaint charged that Dopp failed to perform a contract, dated February 20, 1970, as amended (the "AEL-Dopp contract") in which he had agreed to purchase from AEL 143,900 shares of Series B Voting Participating Convertible Stock ("preferred stock") of Butler Aviation International, Inc. ("Butler").[1] The action, originally commenced in the Delaware Superior Court in and for New Castle County on February 16, 1971, was removed by Dopp to this Court on March 22, 1971 pursuant to 28 U.S.C. § 1441(a) based on diversity of citizenship of the parties. 28 U.S.C. § 1332(a)(1).

On November 15, 1973, upon notice AEL moved the Court for a default judgment against Dopp on the ground that he failed to defend in that he refused to participate in the draft of a pre-trial order or to take part in a meaningful pre-trial conference as required by the rules and orders of this Court thereby rendering a trial impossible on the scheduled date long fixed by the Court.[2] The motion having come on for hearing on November 26, 1973, the Court entered a default, pursuant to Rule 55, F.R.Civ.P., on the issue of liability[3] and then proceeded to trial on the issue of the amount of damages to be awarded, if any.[4]

### 1. The Default.

To understand the entry of the default the pertinent history of the case must be noted. Following the removal of the case to this Court, Dopp answered on April 23, 1971 and asserted three affirmative defenses.[5] On September 23, 1971 Dopp moved to stay this action until final disposition of an action[6] pending in the United States District Court for the Southern District of New York, or in the alternative, to transfer the action to the New York Court pursuant to 28 U.S.C. § 1404(a).[7] These motions were denied on November 29, 1971. AEL v. Dopp, 334 F.Supp. 339 (D.Del. 1971).

On March 3, 1972, AEL moved for partial summary judgment and on April 24, 1972, Dopp moved for leave to file an amended answer.[8] On December 21, 1972, the Court granted AEL's motion for partial summary judgment dismissing the three original affirmative defenses asserted on the ground that none of them was valid as a matter of law. The Court also permitted Dopp to amend his answer to assert his proposed Fourth and Fifth Affirmative Defenses and Counterclaim. American Electronic Laboratories, Inc. v. Dopp, 352 F.Supp. 835 (D.Del.1972). In its opinion the Court also stated that "the case should proceed promptly to trial."

After Dopp filed his amended answer and counterclaim, AEL on January 17, 1973 moved for trial at the earliest convenient date.[9] When Dopp did not object to a trial date within five days of the motion for trial, as required by Local Rule 13 B,[10] the Court wrote the parties on January 26, 1973 and called a conference for February 2, 1973 in order to set dates for a pre-trial conference and trial.[11]

On January 31, 1973, the Court was informed that at the request of Dopp's

---

1. Docket Item 1. For prior proceedings in this case, see 334 F.Supp. 339 (D.Del.1971); 54 F.R.D. 241 (D.Del.1972); 352 F.Supp. 835 (D.Del.1972).

2. Docket Item 115.

3. Docket Item 119, Trial Transcript ("Tr.") 14.

4. Tr. 14–105.

5. Docket Item 5.

6. Dopp v. American Electronic Laboratories, Inc., et al., D.C., 55 F.R.D. 151.

7. Docket Item 34.

8. Docket Items 57 and 63.

9. Docket Item 84.

10. Civil Rules of the United States District Court for the District of Delaware ("Local Rules") adopted pursuant to Rule 83, F.R. Civ.P.

11. Docket Item 128, p. 1.

counsel the parties had agreed to post-pone the February 2 conference to February 16, 1973.[12] The Court acquiesced. Then by letter of February 14, 1973, Dopp's counsel advised the Court that both parties had agreed to postpone the February 16 conference indefinitely as the parties were then involved in settlement negotiations.[13]

On April 10, 1973, AEL's counsel wrote the Court stating that settlement negotiations had been unsuccessful and requested the twice postponed conference be rescheduled in order to set a pre-trial conference and trial date.[14] The Court then reset the meeting for May 22, 1973.[15] However, upon arriving at the meeting instead of proceeding to set a pre-trial conference and trial date, Dopp's then counsel, without giving reasons, stated that they and local counsel intended to move for leave to withdraw as Dopp's attorney. AEL indicated that while it did not wish to force Dopp to retain his then counsel, it did believe it was entitled to a speedy trial in view of the previous postponements to which AEL had agreed at Dopp's insistence, and particularly since AEL had been pressing for trial since January.[16]

In view of this development, the Court decided to give Dopp additional time to retain substitute counsel and rescheduled the meeting to June 20, 1973. The Court ruled that if Dopp had not made effective substitution of counsel by that time, the Court would require Dopp's then retained counsel to continue with the case, and a cut-off date for discovery would be ordered and a trial date set. By order of June 14, 1973, the Court permitted Dopp to substitute its present counsel and authorized a fifth postponement of the conference until July 26, 1973 in order to permit Dopp's new counsel to prepare for the meeting.[17] This date was again postponed by stipulation of counsel to August 2, 1973.[18]

On August 2, 1973 the long awaited meeting was held, a jury trial was set to begin on November 26, 1973 and a pre-trial conference was scheduled for October 4, 1973.[19] The Court ordered that a proposed pre-trial order, requests for jury instructions and any special jury voir dire questions had to be supplied for the pre-trial conference. Dopp's new attorneys raised no objections. Local Rule 11 sets forth the detail requirements for a pre-trial conference and contents of the order.

On October 1, 1973, AEL submitted its proposed pre-trial order, unsigned by Dopp's attorneys and without containing any of the material which was required to be furnished by Dopp.[20] AEL's proposed pre-trial order was accompanied by a letter from AEL's attorney stating that he had written Dopp's chief counsel on September 14 and 26, 1973 asking what material Dopp wished included in the proposed pre-trial order.[21] No information was ever supplied by Dopp's counsel to AEL's attorney in response to these letters in complete disregard of Local Rule 11 C which provides, in part: "Each attorney before pretrial shall become thoroughly familiar with his case and shall confer with the other attorneys as long and as frequently as may be required to enable plaintiff's attorney to comply with Paragraph D of this Rule." [22] At the time AEL's attorney wrote Dopp's chief counsel on September 14 he outlined the information needed and enclosed a copy of Local Rule 11. There is no question that Dopp was placed on full notice of the requirements

---

12. Docket Item 128, p. 2.

13. Id. at p. 3.

14. Id. at p. 4.

15. Id. at p. 5.

16. Docket Item 115, p. 4; Docket Item 118.

17. Docket Items 95 and 128, p. 6.

18. Docket Item 98.

19. Minutes of meeting, Docket Record 8/2/73. This gave counsel nine weeks to prepare for the pre-trial conference and over sixteen weeks to prepare for the trial.

20. Docket Item 108.

21. Docket Item 128, p. 16.

22. Par. D of Local Rule 11 lists in detail the contents of the proposed pre-trial order.

of Local Rule 11.[23] Indeed, Dopp has not attempted to plead ignorance of the Rule.

On October 4, 1973 at the scheduled pre-trial conference, Dopp's chief counsel did not appear although his local counsel did attend. Dopp's local counsel, not being in a position to go forward with the pre-trial conference, moved to postpone the conference for one week to permit Dopp to attempt to comply with some settlement arrangement he had allegedly made with AEL. The Court granted the motion, continued the pre-trial conference to October 18, 1973, and required a complete pre-trial order and jury instructions to be submitted to the Court on or before October 15, 1973. The jury instructions could be omitted if the parties waived a jury trial by October 15. The Court also instructed Dopp's local counsel to advise his out-of-state chief counsel of his obligations to comply with Local Rule 11 and that the Court would consider entering a default if the Rule were not followed.[24]

Dopp's chief counsel failed utterly to comply with the Court's instructions in that he did not assist or participate in preparing a proposed pre-trial order, file such an order or his request for jury instructions.[25] At the aborted October 18 pre-trial conference Dopp's local counsel stated:

"As of this moment, sir, there has not been compliance by me and my associate on behalf of our client with the direction of the Court in terms of assistance and fulfilling our responsibility in cooperating to present a pretrial order, nor has there been an official position taken before the Court with reference to filing of the prayers for charge to the jury, the instructions to the jury, which the Court made clear were to be filed by this past Monday, October 15, 1973, if the defendant was still maintaining an entitlement to have this case tried to a jury." [26]

Dopp's local counsel also made it clear that he had advised Dopp's chief counsel who was in charge of the case of the consequences of this failure of responsibility.[27] However, it was Dopp's chief counsel's belief that the case would be settled.[28] On the other hand, AEL's attorney continued to press for judgment on the ground that, while Dopp had on several occasions in the past agreed to settlement terms, he was never able to comply with them.[29]

The fact is clear that at the aborted pre-trial conference on October 18, 1973, Dopp had never signed any settlement agreement, much less complied with the terms of any such settlement [30] and had completely failed to further defend this action by complying with Local Rule 11. As the Court pointed out at the aborted pre-trial conference:

"It wasn't an idle threat that I made when Mr. Haydon [Dopp's chief counsel] was here before [August 2, 1973], that if he didn't comply that I would consider defaulting the matter and that puts it up to Mr. Dopp to do something." [words added] (Docket Item 111, p. 6.)

Indeed, Dopp's local counsel recalled the statement saying:

". . . I do know when I was last here that the Court did say unless there were compliance that the Court would entertain a motion for default." (Docket Item 111, p. 7.)

The Court directed AEL's attorney to move for a default and set the hearing on that motion for November 26, 1973, the date originally set for trial.[31]

■ The motion came on for hearing as scheduled and Dopp's attorney took

23. Docket Item 128, p. 14 and 15.

24. Docket Item 128, p. 17–18.

25. Docket Item 111, p. 2.

26. Id.

27. Id. at p. 7–11.

28. Id. at p. 3–4. At no time did the Court participate in any settlement negotiations.

29. Id. at p. 5.

30. Docket Item 111, p. 3, 9–10; Tr. 13.

31. Docket Item 111, p. 5; Docket Items 115, 116 and 117.

the position that his refusal to participate in pre-trial proceedings and go to trial was not willful because he believed the case could be settled. While it is true the parties directly attempted to settle the case on several occasions before October 31, 1973, Dopp apparently was never able to comply.[32] The Court then entered a default against Dopp because it was abundantly apparent that he would not continue to defend the action by complying with the Local Rules and orders of this Court.[33] Indeed, the adversary process in this case had been halted because of an essentially unresponsive party. It became incumbent upon the Court in such a situation to protect the diligent party lest it be faced with further indeterminable delay and continued uncertainty as to its rights. The delay of the trial, which AEL demanded in January 1973 and which had been definitely fixed with more than sixteen weeks' advance notice, became unreasonable in October 1973 particularly when it appeared that the defendant had deliberately chosen delay as a part of his litigation strategy. This Court by repeatedly postponing the matter had afforded Dopp every reasonable opportunity to dispose of the case by settlement if that were his desire. But in fairness such postponements could not be continually granted when the diligent party would suffer. Here there was no mistake, inadvertence, surprise or excusable neglect on Dopp's part. His refusal to comply with the Court's rules and orders after full and adequate advance warnings was a measured risk which he undertook knowing full well all the facts and consequences of his actions and he may not now be heard to complain of the entry of default on the issue of liability. See Link v. Wabash Railroad Co., 370 U.S. 626, 634–635, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); Gulf Oil Co. v. Bill's Farm Center, Inc., 449 F.2d 778 (C.A.8, 1971).

### 2. *Ascertainment of Damages.*

The AEL-Dopp contract originally called for the sale of 143,900 shares of Butler preferred stock by AEL to Dopp on March 13, 1970 at the price of $11.50 per share.[34] The closing date was extended at Dopp's request by AEL until May 15, 1970 in consideration of Dopp's agreement to increase the price to $12.50 per share.[35] The closing date was again later changed to December 3, 1970 [36] and was finally scheduled to take place at Colmer, Pennsylvania on February 15, 1971.[37]

Since this is a diversity case, this Court in deciding questions of conflict of law must follow the rules prevailing in Delaware. Klaxon Co. v. Stentor Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Paragraph 8 of the AEL-Dopp contract provides that the agreement shall be governed by the laws of Pennsylvania. By virtue of this provision Delaware courts would apply Pennsylvania law which the parties have agreed would govern. Wilmington Trust Co. v. Wilmington Trust Co., 26 Del.Ch. 397, 24 A.2d 309 (Supr.1942). Alternatively, Delaware conflict law would apply the law of the place of performance, again Pennsylvania where the closing was to take place. Stone & Webster Eng. Corp. v. Brunswick Pulp & P. Co., 58 Del.Ch. 374, 209 A.2d 890 (Supr.1965).

The rule in Pennsylvania for measuring damages for a buyer's breach of a contract for the purchase of stock generally is the difference between the *market value* of the stock at the time and place of delivery and the contract price. Allen v. Mitten Bank Securities Corp., 129 Pa.Super. 341, 195 A. 459, 462–463 (1937); Flannery v. Wessels, 244 Pa. 321, 90 A. 715, 716 (1914). Although there is authority in Pennsylvania that in the case of a breach of contract to purchase specific shares of

---

32. Docket Item 117; Tr. 13–14.

33. Tr. 14.

34. Plaintiff's Exhibit ("Px.") B.

35. Docket Item 1, Ex. B.

36. Docket Item 1, Ex. C.

37. Docket Item 1, Ex. D; Tr. 63–64.

stock, the seller may recover the entire contract price, Allen, *supra,* Flannery, *supra,* Vilsack v. Wilson, 269 Pa. 77, 112 A. 17 (1920), in this case AEL has limited its claim of damages to the difference between the market value at the time of delivery and the contract price.

■ The market value of stock can be defined generally as the price that a willing buyer and a willing seller would agree upon in the market place at the relevant time. In the course of the trial on damages, AEL introduced a report [38] and the testimony [39] of an expert witness, Martin J. Whitman, a chartered financial analyst, financial consultant and stockbroker, to establish the value of the 143,900 shares of Butler Preferred Stock was $300,000 on February 15, 1971; the critical date on which the AEL-Dopp contract was breached by Dopp. AEL proffered the testimony of a. second witness, Jesse H. Riebman,[40] and the AEL-Dopp contract to establish the contract price of the shares ($12.50 per share) and the date of the breach.

■ The factors used by Mr. Whitman in assessing the value of the Butler Preferred Stock in question reflect market value. Mr. Whitman, both in his testimony and report, indicated that in arriving at the $300,000 value he considered: the market prices of Butler [41] and its subsidiary, Butler's poor earnings record, Butler's weak financial position including a critical cash flow situation, the unstable management situation,[42] particular characteristics attached to the block of Butler preferred in question,[43] book tangible asset values, intangible assets [44] and a purchase offer made in February 1971.[45]

■ Dopp attempted to rebut Mr. Whitman's testimony by pointing out in his brief,[46] how experts have testified at other times that a premium of 25 percent for control stock is low whereas Mr. Whitman did not in his testimony quan-

---

38. Px. A.

39. Tr. 15–61.

40. Id. at p. 61–77.

41. Butler common stock traded on the American Stock Exchange and closed on February 15, 1971 at 6⅜ on a volume of 11,300. During the month of January 1971, Butler common stock ranged from a high of 5⅞ to a low of 4⅝ on a volume of 59,000 shares. Although Butler preferred shares were not listed as of February 15, 1971 (Tr. 22), they were convertible to common shares on a 1 to 1 basis before December 31, 1970 and on a 10 to 9 basis before December 31, 1971. Even so, Mr. Whitman placed very little weight on the market price of Butler common because he believed that the relatively low volume buyers in the American Stock Exchange were probably unaware of adverse developments due to an absence of pertinent news releases and an absence of the knowledge of SEC filings which would have adversely affected the value of the large block of Butler preferred under consideration. (Ex. A, p. 2 and Tr. 25). Dopp agrees that the market price of Butler common shares on the critical date is of little importance in establishing the value of a large block of Butler preferred stock. (Def. Brief, p. 8).

42. Dopp had resigned as president on January 4, 1971. (Tr. 86).

43. The characteristics include: A right of first refusal to Butler, which ran until December 31, 1972, and which would have prevented free transfer of the shares (Tr. 23); the fact Butler preferred shares were not listed and therefore had to be converted to be marketable; a blockage factor due to the relative size of the block compared to the quarterly volume of Butler common on the American Stock Exchange; and the possible beneficial effect of the stock acting as a control block.

44. Mr. Whitman articulated these at page 5 of Px. A.

45. The Foothill Group, Inc. ("Group") of Century City, California proposed that it obtain an option to buy a controlling interest in Butler at $3.00 per share. (Px. A, p. 5). This offer was for 333,333 *new* shares which represented absolute control of Butler, a secured position and a right to buy stock in a subsidiary at ten cents a share when the stock was selling at two dollars (Tr. 57). Mr. Whitman reasoned that since this offer reflected *new* money coming into the corporation, the value of a *block*, even a control block, purchased on the open market which by its nature did not reflect any new money to Butler and which did not have the advantages of the Group's offer, would be considerably less than $2.00 per share. (Tr. 57).

46. Docket Item 122, p. 7.

tify the weight given to the possible control nature of the Butler stock in question. This attack on Mr. Whitman's testimony obviously fails; first, because there was no evidence the stock in question actually was a control block,[47] and second, even if it were a control block, Dopp introduced no evidence that an expert *in this case* should have taken into account a 25 percent premium.

■ Second, Dopp attacks Mr. Whitman's valuation by pointing out that Whitman relied in part on the conclusion that three conditions would have to be fulfilled before the value of the Butler stock would exceed $300,000.[48] Mr. Whitman also concluded that as of February 15, 1971 the three conditions had not been fulfilled. However, Dopp testified the three conditions have in fact been fulfilled, but his testimony indicates that, to any extent they were fulfilled, it was by events which occurred *after* February 15, 1971, the scheduled closing and the date of the breach.[49]

That these conditions may have been met after the date of the breach does not discredit a valuation of stock based on the undisputed fact that the conditions were not met as of February 15, 1971, without some convincing showing that Whitman should not have relied on the fact that the conditions were unfulfilled as of the critical date. Indeed, Mr. Whitman's testimony was replete with reasons why a buyer on February 15, 1971 would reasonably conclude there was a high probability that the three conditions would not be met in the near future and that this consideration would

have lowered the market value of the Butler stock. On the other hand, Dopp factually failed to rebut Mr. Whitman's rationale in this respect.

■ Third, Dopp testified that the intrinsic value of the stock could be found by estimating Butler's assets and subtracting its liabilities. Dopp asserts that in fact a balance of $19,000,000 would remain after the assets of Butler were sold and the debts satisfied. Dopp stated that after the appropriate liquidation taxes were paid, there would still be at least $15 a share for distribution to the shareholders. (Tr. 85). Thus, Dopp urges the Court to conclude that AEL suffered no damages by reason of Dopp's breach.

Dopp's position is fraught with difficulties. For one, Dopp's testimony does not make clear whether or not his evaluation was based on conditions as of the critical date, February 15, 1971. His brief contends that valuations based on subsequent events may be considered. However, this Court need not determine the validity of that assertion since even if this Court were to find that Dopp effectively demonstrated each share of stock had a liquidation value of $15 as of February 15, 1971, the fact remains that *liquidation value* is not the appropriate measurement for determining damages for breach of a contract to sell stock where, as here, no evidence suggests an intent on the part of the company to liquidate and no evidence was presented showing that it was impossible to determine market value. As pointed out above, when a reasonable de-

---

47. Mr. Whitman's testimony only indicates he considered any possible control factor which may have existed on the critical date. (Tr. 27). Dopp's testimony, stating that he believed AEL was in control of Butler after the critical date, does not prove that the block of stock in question, which represented only a portion of the total Butler shares now owned by AEL, was by itself a control stock on the critical closing date. (Tr. 72, 73 and 92.)

48. "BAI appears to have potential. However, for these 143,900 shares to have a value, in my judgment, in excess of $2.00 per

share, three conditions would have to be fulfilled. First, the shares, as a practical matter, would have to be made marketable. Second, BAI's financial position would have to be improved materially. Third, BAI's improved finances would have to be attained on a basis that the company did not sell, or otherwise lose, the basic earning power it had demonstrated before 1969 in its aviation services and motor carrier businesses. As of February 15, 1971, the evidence is that these conditions have not been fulfilled." (Px. A, p. 6).

49. Tr. 80.

termination of *market value* is available as was demonstrated by Mr. Whitman's testimony, then *market value* is the appropriate measure of damages.

 Finally, Dopp argues that AEL had an opportunity to mitigate its damages after the breach of contract by Dopp. By the time of trial on damages, AEL was shown to own 225,520 shares of the 1,060,000 outstanding shares of Butler stock.[50] Several months before the trial, Greyhound reportedly offered Butler three-quarters of a share of Greyhound[51] for every share of Butler —effectively an offer to Butler of $11.-50 per share. Butler rejected the offer as being too low.[52] Dopp urges this Court to conclude from these facts, first that AEL was in control of Butler by reason of its ownership of 225,520 of the outstanding shares, and second that through this control AEL effectively turned down an offer to receive $11.50 for each of its shares, thus failing to mitigate the damages caused by Dopp's breach of contract on February 15, 1971.

Under Pennsylvania law where a seller has tendered stock according to a sales contract and the buyer breaches the contract by refusing to buy, the seller can only recover the difference between the contract price and the market value of the stock at the time of the breach. The fact that the seller afterwards recoups by making advantageous sales of the stock to others does not lessen or alter the liability of the buyer. Allen, *supra*, 129 Pa.Super. at 463, 195 A. 459. The seller has assumed the risk of the stock. He can either sell it for the market value and thus be made whole by recovering the difference between the market value and the contract price or he can maintain ownership after the breach, as was done here, and assume on himself the risk of the stock subsequently advancing or retarding in value. Since the seller assumed the risk,

the seller reaps the profit of any advance in value just as he must suffer any loss.

Thus, AEL had no duty to accept Greyhound's offer even if the Court were to find that AEL had the power to accept such an offer.

 In review of Dopp's position, it is evident that he has failed to rebut Mr. Whitman's testimony that the market value of the 143,900 shares of Butler preferred stock was $300,000 on February 15, 1971 and has failed to demonstrate any reason why the general rule in Pennsylvania, that damages for breach of a contract for the sale of stock are measured by the difference between the contract price and the market value on the date of breach, should not apply in this case. This Court has been persuaded by Mr. Whitman's testimony that the market value of the 143,900 shares of Butler preferred stock was $300,000 on February 15, 1971, and that AEL has met its burden of proving damages in the amount of $1,498,750[53] caused by Dopp's breach. In addition, AEL is entitled under Pennsylvania law to interest on this sum at the rate of six percent (6%) per annum from the date of the breach on February 15, 1971, Formigli Corp. v. Fox, 348 F.Supp. 629, 648 (E. D.Pa.1972), and Pennsylvania law relating to moratory interest will be applied by a Delaware Court in instances where Pennsylvania was the place of performance of the contract. Stentor Electric Mfg. Co. v. Klaxon Co., 125 F.2d 820 (C.A. 3, 1942). A judgment will be entered to this effect plus suit costs.

The above shall constitute the Court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

### FINAL JUDGMENT

For the foregoing reasons, it is ordered that judgment by default is hereby entered in favor of the plaintiff,

---

50. Tr. 73.

51. At that time Greyhound was selling for about $15.00 per share. (Tr. 74).

52. Tr. 74.

53. $12.50/share x 143,900 shares (contract price) minus $300,000 (market value)=$1,498,750 (damages).

American Electronic Laboratories, Inc. against the defendant, Paul S. Dopp, in the sum of One Million Four Hundred Ninety-Eight Thousand Seven Hundred and Fifty Dollars ($1,498,750), together with interest thereon at the rate of six percent (6%) per annum from February 15, 1971 plus suit costs.