Richard SCHOENKOPF, d/b/a
"Vend-Mark"

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, Loew's Theatres, Inc., R. J. Reynolds Tobacco Company.

Civ. A. No. 78-1592.

United States District Court,
E. D. Pennsylvania.

Jan. 18, 1980.

Arnold Levin, Michael Fishbein, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for plaintiff.

John Harkins, Jr., Marjorie Marinoff, Richard Bernstein, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for R. J. Reynolds Tobacco Co.

Franklin Poul, Diane Sigmund, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Loew's Theatres, Inc.

Charles Hileman, III, Peter Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Brown & Williamson Tobacco Corp.

### MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The plaintiff, Richard Schoenkopf, brought this action against R. J. Reynolds Tobacco Company (RJR), Brown & Williamson Tobacco Corporation (B&W), and Loew's Theatres, Inc. (Lorillard) for alleged violations of the Sherman Act, the Robin-

son-Patman Act, and for alleged breaches of contracts which the plaintiff allegedly entered with each of the three defendants. The plaintiff has sought treble damages for the alleged Sherman Act violations, damages for his contractual claims, and injunctive relief under the Robinson-Patman Act.

The plaintiff alleged that: (1) the defendants conspired to refuse to deal with the plaintiff, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976); (2) the defendants violated section 2(d) of the Robinson-Patman Act, 15 U.S.C. § 13(d) (1976), by failing to make the promotional allowances they offer to the operators of cigarette vending machines available to all operators of cigarette vending machines; and (3) each defendant breached its contract with the plaintiff. The case was tried before a jury from October 11, 1979 to October 23, 1979, and at the end of the plaintiff's case, the defendants filed Rule 50 motions for a directed verdict on the plaintiff's Sherman Act claims. After hearing argument thereon, the Court directed a verdict for all defendants on the Sherman Act claims. By agreement of the parties, the jury was discharged and it was stipulated that the Court should decide the plaintiff's Robinson-Patman and contractual claims on the basis of the testimony presented to the jury, together with other facts stipulated by the parties.

## I. *The Sherman Act Claims*

The six major tobacco companies, American, Philip Morris, Liggett & Myers, RJR, B&W, and Lorillard, each market many different brands of cigarettes. One marketing technique employed by all of these companies is the sale of their brands of cigarettes to operators of cigarette vending machines. The number of different brands marketed by these companies, however, greatly exceeds the number of columns in a cigarette vending machine. To encourage vending machine operators to display and sell their brands of cigarettes, each of the six major tobacco companies offers a promotional allowance to the vending machine operators for placing various combinations of their brands in the columns of a machine. These allowances range from approximately $1.50 per year to approximately $15.00 per year, depending upon the type and/or number of brands placed in the machine.

Many vending machine operators have no knowledge of these promotional allowances, however, because they are not in direct contact with the tobacco companies and do not read the trade journals in which these allowances are advertised. These operators typically own only one or two vending machines, and locate them at their places of business, which are usually gas stations, stores, or restaurants. The operators of a large number of vending machines take advantage of these promotional allowances much more frequently than the small operators.

The plaintiff, in the middle of 1976, started a company known as "Vend-Mark". The purpose of Vend-Mark was to act as an independent reporting agent for people who operated only a few vending machines and wished to participate in the promotional allowance programs offered by the tobacco companies. The plaintiff entered into agreements with each of the six major tobacco companies that basically provided that Vend-Mark would submit a promotional allowance report to the company at the end of each quarter which covered all of the machines of operators for whom the plaintiff was the reporting agent. The tobacco companies paid Vend-Mark directly for these reports, and the plaintiff, pursuant to the arrangements he had made with the small operators, remitted fifty percent of the payment covering their particular machine or machines to them.

Vend-Mark was successful and grew rapidly. By the end of the third quarter of 1977, Vend-Mark was reporting for 3,496 machines, and there were 5,520 machines for which Vend-Mark was reporting at the end of the first quarter of 1978. At the time of trial, Vend-Mark was reporting for approximately 4,200 machines.

In December of 1977, however, B&W notified the plaintiff that B&W offered participation in vending machine display plans only to those people who actually owned or

operated the vending machines. A clause to this effect was contained in the agreement between B&W and the plaintiff, and B&W therefore terminated its agreement with the plaintiff. B&W and the plaintiff attempted to negotiate an alternative arrangement that would be satisfactory to both parties, but none could be reached. On March 6, 1978, B&W finally terminated all negotiations with the plaintiff.

Lorillard also terminated its reporting agreement with the plaintiff on March 31, 1978. Its primary reason for terminating the plaintiff was a failure of performance by the plaintiff in its submission of reports regarding the placement of Lorillard products. In addition, RJR terminated its reporting agreement with the plaintiff on May 1, 1978, due to a determination on the part of RJR that it was more advantageous to RJR to have its own personnel contact the individual cigarette vending machine operators and pay the promotional allowances directly to the operators in cash when its salesmen made calls on the operators.

The plaintiff claims that the defendants conspired to refuse to deal with him, in violation of section 1 of the Sherman Act. At the end of the plaintiff's case, however, the Court concluded that there was insufficient evidence from which a jury could reasonably find the existence of a conspiracy among the defendants to terminate the plaintiff, and accordingly directed a verdict for the defendants on the plaintiff's Sherman Act claims. In granting the directed verdict, we have given the plaintiff the benefit of every inference that could be drawn from the evidence he presented. Furthermore, the Court did not weigh the credibility of any witness in arriving at its decision to grant the defendants' Rule 50 motions.

An examination of the testimony in this case reveals conduct on the part of the three defendants which could be considered parallel conduct. B&W terminated · the plaintiff on March 6, 1978, Lorillard terminated the plaintiff on March 31, 1978, and RJR terminated the plaintiff on May 1, 1978. The plaintiff, however, was dealing with all six major tobacco companies, and at the time of trial was still dealing with three of these companies. In addition, B&W, prior to its termination of the plaintiff, made an offer to the plaintiff in the form of a counter-proposal to continue their relationship provided that B&W could send its payments directly to the vending machine operators. The plaintiff rejected this offer and elected to not continue to do business with B&W.

Moreover, the representatives of the defendants, who at trial were called by the plaintiff as on cross-examination, stated different reasons for their decisions to terminate the plaintiff. The representative of B&W testified that B&W terminated the plaintiff because of a company policy that absolutely prohibited a non-owner or non-operator of a vending machine to participate in B&W's promotional allowance programs. Lorillard's representative testified that Lorillard terminated the plaintiff due primarily to the inaccuracy of the reports that the plaintiff submitted to Lorillard. Finally, the representative of RJR testified that RJR terminated the plaintiff because of a desire to have RJR personnel directly contact the operators of vending machines and to make direct cash payments to them in an effort to induce the operators to place as many RJR brands as possible in their machines.

The plaintiff produced uncontradicted evidence that there was a trade show of the National Automatic Merchandising Association (NAMA) in Chicago between October 12, 1977 and October 16, 1977, which representatives of the major tobacco companies, including the defendants, attended and had attended for many years. It was the custom of the tobacco industry to have the person in charge of vending for a particular tobacco company attend the show. No evidence was presented by the plaintiff, however, that the representatives of the three defendants had any discussions concerning the plaintiff at the Chicago trade show. Furthermore, the representatives of the defendants called to the stand by the plaintiff as on cross-examination testified that there

was no discussion concerning the plaintiff at the trade show or any other time. In addition, each of the defendants' representatives testified without contradiction by the plaintiff that they had no knowledge of the actions of the other two defendants in terminating the plaintiff.

The only other witness called by the plaintiff's counsel was the plaintiff himself, and he offered no additional evidence concerning the existence of a conspiracy other than the fact that a representative of B&W told him that there had been a meeting in Chicago of the NAMA and sent the plaintiff a report of the meeting that appeared in a trade journal entitled the "American Automatic Merchandiser". B&W's representative testified without contradiction that he sent the article to the plaintiff because he thought it would be of interest to the plaintiff in that the article discussed some of the problems faced by cigarette vending machine operators and contained some interesting information about the vending industry.

 It is well established that a conspiracy may be established by the presentation of circumstantial evidence. In *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the Supreme Court stated: "To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement." *Id.* at 259 (citations omitted). The Supreme Court, however, admonished that

> this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely. *Id.* at 259–60 (footnote omitted).

Our Third Circuit, when confronted with a case involving consciously parallel business behavior in *Venzie v. United States Mineral Products Co.*, 521 F.2d 1309 (3d Cir. 1975), stated that in order to establish the existence of a conspiracy from evidence of parallel business behavior, a plaintiff must also prove two additional elements: "(1) a showing of acts by defendants in contradiction of their own economic interests . . . ; and (2) satisfactory demonstration of a motivation to enter an agreement." *Id.* at 1314 (citations omitted). Since the plaintiff in the case before the Court was attempting to establish the existence of a conspiracy among the defendants through consciously parallel business behavior, it was his burden to prove these two additional elements. We concluded that the plaintiff did not present sufficient evidence from which a jury could reasonably conclude that either of the two additional requirements set forth in *Venzie* were satisfied.

Although the plaintiff attempted to bring out on cross-examination of the representatives of the three defendants that the action of each defendant in terminating the plaintiff was in contradiction of their own economic interest, and although the plaintiff argued that it was, there was insufficient evidence from which a jury could reasonably so find. The evidence presented through the plaintiff's cross-examination of the defendants' representatives was that each defendant decided that dealing with the plaintiff was not economically beneficial to it. The evidence was uncontradicted that the plaintiff did not make any effort to persuade vending machine operators to utilize any particular display plan for which the defendants offered a bonus, but only reported to the defendants when a bonus was due to the vending machine operator by that particular defendant. In effect, while Vend-Mark provided a service to the vending machine operators, it did not directly benefit any particular defendant. RJR testified that it terminated the plaintiff because Vend-Mark deprived it of the benefit of being able to continue its policy of having its salesmen pay cash directly to the vending machine operators in order to personally encourage the vending machine operators to utilize one or more of its bonus

display plans. Lorillard testified that it terminated the plaintiff primarily because it was not economically beneficial to it to make payments to the plaintiff since the plaintiff's reports were inaccurate. B&W testified that it terminated the plaintiff because of its policy that it was more economically beneficial to it to prohibit bonus payments from being made to anyone other than the vending machine owner or operator. B&W, however, was willing to continue dealing with the plaintiff but insisted that its bonus payments be delivered directly to the vending machine owner or operator.

Furthermore there was insufficient evidence from which a jury could reasonably find a "satisfactory demonstration of a motivation to enter an agreement." *Venzie, supra* at 1314 (citations omitted). The plaintiff did not offer sufficient evidence of any motive that the defendants had for entering into a conspiracy to refuse to deal with the plaintiff. In addition, the reasons posited by the defendants for terminating the plaintiff, and the fact that the plaintiff's business did not benefit any one of the defendants, provided no motivation for the defendants to conspire by agreeing to refuse to deal with the plaintiff.

The plaintiff offered no direct evidence to contradict the assertions by the representatives of the defendants that they were not aware of the terminations of the plaintiff by the other defendants. The plaintiff's evidence does stress, however, that the terminations by the defendants occurred on March 6, 1978 (B&W), March 31, 1978 (Lorillard), and May 1, 1978 (RJR). Although this Court did not base its directed verdict on the failure of the plaintiff to prove "conscious" parallelism, there is nonetheless a question presented as to whether the parallelism in this case was "conscious."

■ In conclusion, the evidence presented by the plaintiff demonstrated that the defendants had valid business reasons for acting as they did, that their actions were consistent with the unilateral exercise of business judgment, and that their actions did not require the participation of the other defendants in order to advance their independent self-interests. Pursuant to *Venzie*, the plaintiff therefore failed to carry his burden of introducing sufficient evidence from which a jury could reasonably find that a conspiracy existed among the defendants to refuse to deal with the plaintiff.

■ In determining that a verdict should be directed for the defendants on the plaintiff's Sherman Act claims, the Court did not weigh the credibility of the witnesses and considered all of the evidence presented by the plaintiff as true, including the hearsay evidence offered against all of the defendants on the ground that such evidence was admissible as to all defendants pursuant to the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). The Court recognizes that the co-conspirator exception to the hearsay rule requires a finding by the Court that there was a preponderance of independent evidence, after weighing credibility, showing the existence of a conspiracy, that the declarant and defendants were members of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. The Court, in directing a verdict for the defendants on the ground that the plaintiff's evidence was not sufficient to prove the existence of a conspiracy, did nonetheless consider all of the hearsay evidence presented by the plaintiff pursuant to the co-conspirator exception to the hearsay rule.

It is conceivable that a jury could elect to not believe the defendants' testimony that they did not conspire to refuse to deal with the plaintiff. This alone, however, will not sustain the denial of a motion for a directed verdict. The *Venzie* Court stated:

> While the jury was free to disregard the defendants' testimony that no agreement of any kind was formulated during the course of these contacts, mere disbelief could not rise to the level of positive proof of agreement to sustain plaintiffs' burden of proving conspiracy. *Id.* at 1313.

Although this Court has always in the past manifested a reluctance to grant a motion for a directed verdict in antitrust cases and thus deprive the jury of an opportunity to consider the evidence, it was compelled to grant the defendants' Rule 50 motions in this case because of the insufficiency of the plaintiff's evidence and would have had to grant a judgment n. o. v. to the defendants if the case had gone to the jury and a verdict for the plaintiff had been returned. The Court will therefore enter judgment for the defendants on the plaintiff's Sherman Act claims.

## II. *The Robinson-Patman Act Claim*

The plaintiff alleged that the defendants violated section 2(d) of the Robinson-Patman Act, 15 U.S.C. § 13(d) (1976), because they did not offer their promotional allowance to all operators of cigarette vending machines. Section 2(d) provides:

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

The plaintiff has requested an injunction on the ground that section 2(d) was violated in that it requires the defendants to either do business with the plaintiff or seek out and inform every operator of a cigarette vending machine of the bonus display plans and promotional allowances offered by the defendants.

■ A "customer" for the purposes of section 2(d) has been equated with the term "purchaser" contained in section 2(a) of the Act, 15 U.S.C. § 13(a) (1976). *See Brewer v. Uniroyal, Inc.,* 498 F.2d 973 (6th Cir. 1974); *American News Co. v. F.T.C.,* 300

F.2d 104 (2d Cir.), *cert. denied,* 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962). Our Third Circuit has defined a purchaser as "one who purchases, a buyer, a vendee." *Klein v. Lionel Corp.,* 237 F.2d 13, 15 (3d Cir. 1956), *quoting Shaw's, Inc. v. Wilson-Jones Co.,* 105 F.2d 331, 333 (3d Cir. 1939). In order to have standing to sue under section 2(d), a plaintiff must be a purchaser from the defendants. *National Auto Brokers Corp. v. General Motors Corp.,* 376 F.Supp. 620 (S.D. N.Y.1974), *aff'd on other grounds,* 572 F.2d 953 (2d Cir. 1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Becker v. Safelite Glass Corp.,* 244 F.Supp. 625 (D.Kan.1965). In *Becker, supra,* the plaintiff never bought any of the defendant's products, and the Court therefore held that he did not have standing to sue under section 2(a), 2(d), or 2(e) of the Robinson-Patman Act. In *National Auto Brokers, supra,* the plaintiffs were car brokers who acted as intermediaries between car buyers and the defendant car manufacturers. The Court held that the plaintiffs who did not actually purchase the cars from the defendants did not have standing to sue under section 2(d). The Court stated: "[T]hose brokers who merely obtained a power of attorney from a customer and transmitted an order . . . are not purchasers or customers within the meaning of the Robinson-Patman Act." *Id.* at 627.

Other courts have defined a "purchaser" in the same manner as the *Becker* and *National Auto Brokers* Courts. In *Loren Specialty Mfg. Co. v. Clark Manufacturing Co.,* 360 F.2d 913 (7th Cir.), *cert. denied,* 385 U.S. 957, 87 S.Ct. 392, 17 L.Ed.2d 303 (1966), the Seventh Circuit held that a distributor who did not prove that a manufacturer actually sold its products to its sales representatives did not have standing to bring a price discrimination suit under the Robinson-Patman Act. Similarly, the D.C. Circuit, in *Students Book Co. v. Washington Law Book Co.,* 98 U.S.App.D.C. 49, 232 F.2d 49 (D.C. Cir. 1955), *cert. denied,* 350 U.S. 988, 76 S.Ct. 474, 100 L.Ed. 854 (1956), affirmed the judgment of a trial court in a case where the jury had been instructed to

return a verdict for the defendant if it found that the plaintiff was a consignee and not an actual buyer of the defendant's goods.

The Supreme Court has not addressed the issue of standing under section 2(d) of the Robinson-Patman Act, but did consider this section in *F.T.C. v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). In *Meyer*, the Court held that the term "customer" in section 2(d) "includes retailers who buy through wholesalers and compete with a direct buyer in the resale of the supplier's product." *Id.* at 911. The defendant in *Meyer* was an actual purchaser of goods from a manufacturer that was not offering promotional allowances to its purchasers on proportionally equal terms, and the Court's use of the word "retailer" indicated that relief under section 2(d) was available only to persons who actually purchased goods from a party that was not offering promotional allowances to its purchasers on proportionally equal terms.

■ In this case, as mentioned previously, the plaintiff operated a reporting service for the purpose of collecting promotional payments offered by tobacco companies to operators of vending machines for the placement of their respective brands of cigarettes in vending machines. The plaintiff testified that he did not purchase the cigarettes and did not own or lease any vending machines. The plaintiff was not competing with any cigarette vending machine operators. On the basis of the testimony at trial, the Court finds that the plaintiff was not a "purchaser" or "customer" within the meaning of section 2(d) of the Robinson-Patman Act. The Court therefore finds that the plaintiff lacks standing to sue under section 2(d) of the Robinson-Patman Act, and will accordingly deny the injunctive relief requested by the plaintiff and enter judgment for the defendants.

The plaintiff alleges that the recent Third Circuit case of *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979), is dispositive of the standing issue when a party is requesting injunctive relief for a violation of the antitrust laws. In *Mid-West*, the Third Circuit held that the *Illinois Brick*[1] rule did not bar an indirect purchaser from seeking injunctive relief for alleged price-fixing in violation of section 1 of the Sherman Act. The *Mid-West* Court stated that the proximate causation requirements for standing for equitable relief are less strict than when damages are sought, and that the indirect purchaser had sufficiently alleged "threatened loss or damage" under section 16 of the Clayton Act, which allows a private party to sue for injunctive relief. *See* 15 U.S.C. § 26 (1976). The plaintiff argues that it has satisfied the more liberal causation requirements of *Mid-West* and is therefore entitled to pursue its claim for injunctive relief even though it is not a "purchaser."

We reject the plaintiff's contention that it has standing to sue for injunctive relief under *Mid-West*. First, *Mid-West* involved an alleged violation of section 1 of the Sherman Act for price-fixing. There was no claim asserted for price discrimination under any section of the Robinson-Patman Act. Second, the *Mid-West* Court was attempting to clarify the reach and effect of the Supreme Court's decision in *Illinois Brick*, in which the Supreme Court addressed the narrow issue of whether a litigant in a price-fixing case can use the pass-on theory offensively. The Supreme Court did not discuss the Robinson-Patman Act in *Illinois Brick*. Third, the *Mid-West* Court did not state or indicate that it was overruling in any way the great number of cases which have required that a Robinson-Patman litigant be a purchaser before standing to sue exists. Even if the *Mid-West* decision were applicable to the Robinson-Patman claim in this case, we find that the plaintiff has not satisfied the more liberal proximate causation requirements promulgated in *Mid-West*. The plaintiff merely files reports and collects payments for certain vending machine operators whom he alleges were denied the promotional allowances offered to other vending machine op-

1. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

erators by the defendants. The plaintiff is not a purchaser, direct or indirect, from the defendants, and is not and was not entitled to any promotional allowances himself because he did not own or operate a cigarette vending machine.

■ Assuming that the plaintiff did have standing under section 2(d), there was no evidence presented from which the Court could conclude that any of the defendants violated that section. In *Meyer, supra,* and *National Auto Brokers Corp., supra,* the respective Courts were dealing with defendants who had allegedly refused to pay a promotional allowance to the plaintiff and other parties. These situations are very different from the evidence presented to the Court in this case. There is no evidence in the record that any of the defendants ever refused to make a display plan payment to a cigarette vending machine operator. The plaintiff contends that the failure of the defendants to locate every vendor and to make known their display plans to them constitutes a section 2(d) violation, but the plaintiff has not called to our attention any case which imposed this type of an affirmative obligation on a seller. In fact, the Second Circuit, in *Vanity Fair Paper Mills, Inc. v. F.T.C.,* 311 F.2d 480 (2d Cir. 1962), stated that the legislative history of the Robinson-Patman Act "argues against a construction [of section 2(d)] that would require the seller to make an actual 'offer' to all customers, including many who might not be interested." *Id.* at 485. In addition, the FTC regulations applicable to section 2(d) do not require that a seller directly contact every buyer to whom a promotional allowance is offered. 16 C.F.R. § 240 (1979).

### III. *The Contractual Claims*

By stipulation of the parties, it was agreed that the Court should also make a "non-jury" determination as to whether each of the defendants was liable to the plaintiff for an alleged breach of contract. Damage figures have been stipulated to between RJR and the plaintiff and between Lorillard and the plaintiff in the event that the Court finds for the plaintiff. No stipulation as to damages was entered into between B&W and the plaintiff. We will make findings of fact and conclusions of law as to each of these three contract claims. Preliminarily, however, we must determine whether there is a choice of law issue in connection with each of these contract claims.

■■ The jurisdiction of this Court to resolve the contractual claims by the plaintiff against RJR and the plaintiff against B&W is based on diversity of citizenship. There being no basis for diversity jurisdiction in connection with Lorillard, the Court has assumed pendent jurisdiction over the contractual claim by the plaintiff against Lorillard.[2] All of these claims must be determined under state law and federal courts, in both diversity cases and pendent jurisdiction cases, apply the conflict of laws rules of the forum in which the Court is sitting. *Melville v. American Home Assurance Co.,* 584 F.2d 1306 (3d Cir. 1978); *System Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131 (3d Cir. 1977). Although it appears that the parties agree that the law of Pennsylvania should be applied in connection with the contract claims since the only cases cited by them in support of their respective positions are cases applying Pennsylvania law, the Court has nevertheless applied the *Melville* conflicts methodology in determining the law to apply in this case.

■ In *Melville,* our Third Circuit determined that Pennsylvania would employ the conflicts methodologies of "interest analysis" and "grouping of contacts" to contract actions. In analyzing a claim under the grouping of contacts methodology, the *Melville* Court stated that the Restatement of the Law of Conflicts (Second) was to be

---

2. In his complaint, the plaintiff alleged an amount of contract damages against Lorillard that was less than $10,000, thereby destroying diversity jurisdiction between these parties.

After the trial, the plaintiff and Lorillard stipulated that if Lorillard is liable to the plaintiff for breach of contract, the damages for this breach would be $5631.98.

followed. Section 188(2) of the Restatement provides:

> [T]he contacts to be taken into account . . . to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

On the basis of our findings of fact contained herein and applying the "interest analysis" and "grouping of contacts analysis" mandated by *Melville*, the Court finds that it agrees with the parties that Pennsylvania law should be applied in determining the contractual claims in this case.[3]

### A. Background Facts Common To All Of The Plaintiff's Contractual Claims Against The Defendants

In this case, a preponderance of the evidence shows, and the Court finds: The plaintiff, a resident of Pennsylvania, started a business known as Vend-Mark in 1976. The plaintiff filed reports on behalf of operators of a number of cigarette vending machines for the purpose of collecting promotional payments which are offered by the defendants and other tobacco companies for the placement of their respective brands of cigarettes in vending machines. The plaintiff had his place of business in Pennsylvania, and negotiated and entered into an arrangement with each of the defendants in Pennsylvania. The plaintiff submitted reports to the defendants and other tobacco companies each quarter for cigarette vending machine operators who were entitled to receive promotional payments from the companies to which he submitted the reports. The defendants and other tobacco companies paid the plaintiff directly for the amounts claimed in the submitted reports. The plaintiff remitted fifty percent of these amounts to the vending machine operators, and retained the other fifty percent for his services. The plaintiff prepared these reports, submitted them to the defendants and other tobacco companies, received payments from the defendants and other tobacco companies, and disbursed the money due to the vending machine operators for whom he reported. All of this was done at the plaintiff's place of business in Doylestown, Pennsylvania. Although at first the plaintiff reported only for vending machine operators located in the Philadelphia area, by the second quarter of 1977 he began to report for operators located outside Pennsylvania. By the first quarter of 1978, the plaintiff had expanded its reporting services into such places as New Jersey, Delaware, Virginia, Maryland, the District of Columbia, California, Oregon, and Florida.

### B. The Plaintiff's Contractual Claim Against R. J. Reynolds

As to RJR, a preponderance of the evidence shows, and the Court finds: The plaintiff contacted RJR's main office in Winston-Salem, North Carolina, and asked to talk to their local cigarette vending machine representative. RJR told the plaintiff that they would have their local representative contact the plaintiff, and shortly thereafter the plaintiff was contacted by Mr. Ripley of RJR's Philadelphia area office. After discussing his plan for reporting bonus placements for cigarette vending machine operators with Mr. Ripley and Mr. Ripley's supervisor, the plaintiff entered into a contract with RJR under which he was to be paid for the reports he submitted for vending machine operators that qualified for RJR promotional payments. The plaintiff, however, has been paid only for reports submitted on behalf of vending machine operators in the Philadelphia area.

---

**3.** Although it could be asserted that the place of performance of the contract between the plaintiff and RJR was not Pennsylvania because the plaintiff was contacting vending machine operators in states other than Pennsylvania and was submitting promotional allowance reports on their behalf, the Court finds that the central and substantial place of performance of the plaintiff's alleged contract with RJR was Pennsylvania.

The plaintiff asserts that he entered into a contract with RJR in connection with the reporting services he provided for vending machine operators located not only in the Philadelphia area, but also in other parts of Pennsylvania and other states. RJR claims that it had no contract with the plaintiff for any area other than Philadelphia, and has paid the plaintiff only for those vending machine operators located in the Philadelphia area. As previously stated, although the plaintiff initially submitted reports only for vending machine operators located in the Philadelphia area, by the first quarter of 1978 the plaintiff had expanded its reporting services into other areas of Pennsylvania and into such states as New Jersey, Delaware, Virginia, Maryland, the District of Columbia, California, Oregon, and Florida.

RJR manufactures and sells cigarettes to purchasers located throughout the United States. Its cigarette products are sold at the retail level by cigarette vending machine owners and operators with cigarette vending machines located throughout the United States. RJR offered a display plan nationally to vending machine operators, and agreed to pay specified sums of money for placement of RJR cigarette brands in the vendor's machines. The bonus payment display plans were offered by RJR to "all vendors" located throughout the country, and were not limited in any way to the Philadelphia area. In order to collect the bonus payments the cigarette vending machine operator was required to submit a report each quarter specifying the cigarette brand placements in his machine. The plaintiff was preparing and submitting these reports for the cigarette vending machine operators contacted by him.

Beginning in the second quarter of 1977, and extending through the first quarter of 1978, the plaintiff submitted reports to RJR that included machines located outside of the Philadelphia area. The Philadelphia office of RJR, to whom the plaintiff submitted reports for all vending machine operators regardless of their location, sent the reports of the vending machine operators located outside of the Philadelphia area to the respective area offices of RJR where the machines were located with a request that these area offices verify the reports and pay the plaintiff. In May of 1978, when the plaintiff was terminated by RJR, he had received payment only for those vending machine operators located in the Philadelphia area and had not received payment for the vending machine operators located outside of the Philadelphia area.

The plaintiff contacted RJR's main office in Winston-Salem, North Carolina, and inquired about payments for the machines located outside of the Philadelphia area. After he was terminated, RJR told him for the first time that his contract covered only the Philadelphia area. In his letter of May 1, 1978, the national vending sales manager of RJR advised the plaintiff that RJR was terminating all of its business relations with him, and nowhere in the letter did he in any way indicate that RJR's business arrangement with the plaintiff was limited to the Philadelphia area. In his testimony, the national vending sales manager explained that RJR's reason for terminating the arrangement was to enable its own sales personnel to personally contact the vending machine operators and pay them in cash for any bonus payments due pursuant to RJR's vending machine display plan.

In construing a contract, "[t]he intention of the parties is paramount and . . . the court will adopt the interpretation, which under all of the circumstances of the case, ascribes the most reasonable, probable and natural conduct of the parties." *Unit Vending Corp. v. Lacas,* 410 Pa. 614, 190 A.2d 298, 300 (1963). It is also "an axiom of interpretation that the construction placed upon a disputed contract by the parties thereto, as shown by their acts and declarations, will ordinarily be adopted, and will be referred to in determining the true nature of the agreement." *City of Erie v. R. D. McAllister & Son,* 416 Pa. 54, 204 A.2d 650, 660 (1964) (per curiam), *cert. denied,* 379 U.S. 998, 85 S.Ct. 718, 13 L.Ed.2d 701 (1965). *See Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978).

The preponderance of the evidence shows, and the Court finds, that the parties did not intend to limit the plaintiff to the Philadelphia area. On the contrary, the evidence does show that RJR was aware that the plaintiff's reporting services had expanded into other states. RJR received and accepted quarterly reports from the plaintiff covering cigarette vending machines outside of the Philadelphia area for a period of approximately one year without ever advising the plaintiff that he would be paid only for his services in connection with the Philadelphia area cigarette vending machines. Furthermore, the representative of RJR in the Philadelphia area office advised the plaintiff that the reports which pertained to vending machine operators located outside of the Philadelphia area were being checked by the RJR offices in the areas where the machines were located, and that payment was subject only to verification of the accuracy of the reports by those area offices.

We therefore find that RJR must make the bonus payments to the plaintiff for the cigarette vending machines reported by the plaintiff outside of the Philadelphia area.

On the basis of the stipulation as to damages entered into between the plaintiff and RJR, the Court finds that the following sums are due to the plaintiff by the defendant RJR for reports covering vending machine operators located outside of the Philadelphia area:

For the second quarter of 1977 –– $ 1,506.25
For the third quarter of 1977 –– 3,804.25
For the fourth quarter of 1977 –– 5,039.25
For the first quarter of 1978 –– 12,008.00
Total –– $22,357.75

The Court will therefore enter judgment for the plaintiff, Richard Schoenkopf, and against the defendant, RJR, for $22,357.75.

C. *The Plaintiff's Contractual Claim Against Brown & Williamson*

As to B&W, a preponderance of the evidence shows, and the Court finds: The plaintiff signed a "Point-of-Purchase Merchandising Plan Vending Machine Placement Contract" with B&W in October of 1976. Section I.F. of the contract stated:

All cigarette machines claimed for payment must be *owned/leased and operated* by you.

Section II.B. of the contract provided:

Location master lists and/or computer tapes must be postmarked and mailed to Louisville within 45 days from the end of the calendar quarter for which payment is claimed or they will be returned without pay.

Finally, section III.C. of the contract stated:

This contract will be effective until further notice, and can be terminated by either party on 30 days written notice. In addition, B&W may terminate at any time for non-compliance with any provision of this contract.

In July of 1977, the plaintiff entered into a contract with B&W which the parties have agreed superseded the contract signed in October of 1976. The provisions quoted above were contained in the same sections of the July 1977 contract. In addition, the following provision appears in the July 1977 contract (section III.A):

Amounts due to operators under this contract may not be assigned to third parties.

B&W, by a letter dated December 1, 1977, notified the plaintiff that it was terminating its July 1977 contract with him in thirty days. B&W's reason for termination was that the plaintiff, as required by section I.F. of the July 1977 contract, did not own or lease the machines for which he was claiming payment. After its termination letter of December 1, 1977, B&W endeavored to continue the reporting services of the plaintiff, but insisted that the bonus payments had to be made by it to each vending machine operator. This meant that the plaintiff would be required to collect his fee from the vending machine operators. The plaintiff rejected this proposal by B&W.

The plaintiff asserts that he submitted reports to B&W for the fourth quarter of 1977 and should be paid for these reports. B&W defends this contract claim on the ground that the plaintiff did not submit reports for the fourth quarter of 1977, nor did the plaintiff submit the fourth quarter

reports within the time specified in the contract.

In the final pretrial order, signed by all counsel prior to trial and approved by the Court, B&W stated as follows at page 36, ¶ 17:

> Schoenkopf never submitted a computer tape for his accounts for the last quarter of 1977. Brown and Williamson has offered and continues to offer to pay him in full the amounts due to his former accounts at the time he submits such a report.

At trial, the plaintiff testified that exhibit P–122 "represent[s] the lists that were sent to each of the tobacco companies with covering invoices." (N.T. 2.19). He further testified that exhibit P–122 contained "my computer runs to· Brown and Williamson." (N.T. 2.19). Exhibit P–122, introduced into evidence by the plaintiff, contains the reports for the fourth quarter of 1977 prepared by the plaintiff for B&W. The Court finds that the plaintiff has proven by a preponderance of the evidence that the fourth quarter reports were prepared by him and submitted to B&W. B&W raised the issue of the plaintiff's untimely submission of the reports for the fourth quarter of 1977 for the first time in its proposed findings of fact and conclusions of law. The plaintiff was not asked, either on direct examination or cross-examination, when these fourth quarter reports were submitted to B&W.

As heretofore pointed out, the contract between the plaintiff and B&W does provide that the location master lists and/or computer tapes must be postmarked and mailed to B&W within forty-five days from the end of the calendar quarter for which payment is claimed or they will be returned by B&W without payment. B&W claims that the plaintiff has failed to carry his burden of establishing by a preponderance of the evidence that the reports for the fourth quarter of 1977 were submitted to B&W within forty-five days from the end of the fourth quarter of 1977, and is therefore not entitled to payment from B&W for these reports. While the forty-five day

provision of the contract would appear to be a condition which had to be fulfilled by the plaintiff in order to receive payment, the Court finds that B&W in this case has specifically waived the forty-five day limitation in the contract by its statement in the final pretrial order filed in this case, which, as heretofore pointed out, stated:

> Brown and Williamson has offered and continues to offer to pay [the plaintiff] in full the amounts due to his former accounts at the time he submits such a report.

*See Universal Builders, Inc. v. Moon Motor Lodge, Inc.,* 430 Pa. 550, 244 A.2d 10 (1968).

In view of the fact that the Court finds that the plaintiff has proven that the fourth quarter reports were submitted to B&W, and that the forty-five day provision of the contract has been waived by B&W, we find that the defendant B&W is liable to the plaintiff for the sums due in connection with these fourth quarter reports, which, from an examination of the reports contained in exhibit P–122, we find to be the sum of $5,650.00.

The Court will therefore enter judgment for the plaintiff, Richard Schoenkopf, and against the defendant, B&W, for $5,650.00.

### D. *The Plaintiff's Contractual Claim Against Lorillard*

As to Lorillard, the evidence shows, and the Court finds: The plaintiff signed a "Vending Machine Plan" agreement with Lorillard on December 23, 1976. Prior to the signing of this agreement, the plaintiff had discussed with several Lorillard representatives his plan to submit quarterly reports for certain cigarette vending machine operators who were entitled to bonus payments from Lorillard. In response to these discussions, Lorillard's automatic merchandising manager wrote to the plaintiff on December 15, 1976 and advised the plaintiff that a Lorillard representative would be calling on him to sign a "Vending Machine Plan" contract with Lorillard. The letter also stated that on each quarterly report, the plaintiff should attach the following notarized statement:

I certify that Vend Marks [sic] has a signed contract appointing it as agent to collect payment, in connection with Lorillard's Vending Machine Plan, for each of the machine operators owning the machines on lists submitted to Lorillard herewith.

For the fourth quarter of 1976 and the four quarters of 1977, the plaintiff submitted reports to Lorillard setting forth the amount of bonus payments due from Lorillard to the cigarette vending machine operators for whom the plaintiff reported. The plaintiff received payment from Lorillard for all of these cigarette vending machine operators, and subsequently remitted fifty percent of the bonus payments to each of the vending machine operators.

In February of 1978, a representative of Lorillard contacted the plaintiff to discuss with him a number of reporting errors found by Lorillard when it did a spot check in December of 1977 and January of 1978 of some of the machines for which the plaintiff submitted reports for the third quarter of 1977 and compared the cigarette brand placements in these machines at the time of the spot check with the placements reported by the plaintiff for these machines for the third quarter of 1977. After reviewing the results of this spot check with the plaintiff, the Lorillard representative recommended that no deduction be made by Lorillard from its payment to the plaintiff for the reports covering the third quarter of 1977, and no deduction was made. Later that month, however, Lorillard again contacted the plaintiff and advised him that he might be terminated by Lorillard due to the errors in his reporting. In March of 1978, Lorillard orally notified the plaintiff that his contract with Lorillard would be cancelled as of March 31, 1978. Lorillard terminated the plaintiff's contract because of the errors in his reports. On April 5, 1978, Lorillard wrote the plaintiff a letter that confirmed its cancellation of the plaintiff's contract as of March 31, 1978.

The plaintiff claims that he is entitled to payment from Lorillard for the reports he submitted to Lorillard covering the first quarter of 1978. Lorillard claims that the plaintiff is not entitled to payment for these reports because he: (1) did not have a signed contract appointing him as collecting agent with each operator for whom he submitted bonus payment reports; and (2) did not attach the certification required by Lorillard when he submitted the reports to Lorillard.

As we pointed out in Part I of this Memorandum, which dealt with the plaintiff's claims against the defendants under the Sherman Act, the representative of Lorillard who testified at trial stated that Lorillard terminated its contract with the plaintiff primarily because of the inaccuracy of the reports that the plaintiff submitted to Lorillard. Lorillard had spot checked only those reports submitted by the plaintiff for the third quarter of 1977. Of the approximately 2600 machines for which the plaintiff submitted reports for the third quarter of 1977, Lorillard had checked 659 of them in December of 1977 and January of 1978, and found that as to 119 machines, there were discrepancies in the plaintiff's reports either as to brand placements or as to the location of the machine. Lorillard, however, made no deduction from its payment to the plaintiff for its reports for the third quarter of 1977. Furthermore, there is nothing in the record concerning errors found in the plaintiff's reports to Lorillard for the first quarter of 1978, which is the quarter for which the plaintiff is claiming payment.

The plaintiff, after receiving payments from the defendants and the other tobacco companies, remitted fifty percent of these payments to the cigarette vending machine operators for whom he submitted the quarterly reports. The plaintiff escrowed fifty percent of the funds that he received from the defendants and the other tobacco companies, and then disbursed these funds to the vending machine operators entitled to payment. No evidence was presented that the plaintiff ever withheld the money due to the vending machine operators, or that any of the vending machine operators ever claimed that the plaintiff was not authoriz-

ed to receive the bonus payments for them. Nor was there any evidence that Lorillard suffered any loss as a result of the plaintiff's failure to obtain a vending machine operator's signed authorization for the plaintiff to collect the bonus payments due to the vending machine operator.

Lorillard admits, and the Court finds, that the plaintiff submitted reports to Lorillard covering the first quarter of 1978. Lorillard, in its Proposed Findings of Fact and Conclusions of Law, contends that the plaintiff did not prove that he supplied the requested certification with his reports for this quarter. We find that the plaintiff did submit a notarized certification with his reports for the first quarter of 1978. This certification, however, is not in evidence. The contract with Lorillard, which the plaintiff signed on December 23, 1976, does not mention the required certification. Lorillard's requirement that the plaintiff certify his reports is contained in Lorillard's letter to him of December 15, 1976.

■ The Court finds that the certification attached by the plaintiff to the reports he submitted for the first quarter of 1978 was worded in the same manner as the certification he attached to the quarterly reports to Lorillard for the fourth quarter of 1976 and all four quarters of 1977. The plaintiff, however, has not proven by a preponderance of the evidence that the certification which he submitted with his reports for the first quarter of 1978 was in the wording set forth in Lorillard's letter of December 15, 1976. We nevertheless find that the plaintiff has proven by a preponderance of the evidence that he substantially performed the contract with Lorillard for the first quarter of 1978, and that his failure to prove that he did not furnish the required certification did not place him in material breach of contract. *Formigli Corp. v. Fox*, 348 F.Supp. 629 (E.D.Pa.1972); *Jennings v. League of Civic Organizations*, 180 Pa.Super. 398, 119 A.2d 608 (1956). In other words, the plaintiff obtained the information for these reports from the cigarette vending machine operators, computerized the information for Lorillard, and sub-

mitted it to Lorillard. Lorillard never returned any of the reports submitted by the plaintiff to him, nor did it complain to the plaintiff concerning the allegedly improper certification until sometime after the commencement of this litigation.

We find, as was testified by the director of automatic merchandising for Lorillard, who sent the December 15, 1976 letter to the plaintiff stating that a certification was required, that Lorillard's purpose in requiring a certification that the plaintiff have a signed contract with all vending machine operators for whom he reported was that Lorillard wanted to protect itself from the possibility that it might be required to pay the bonus payments again directly to the vending machine operators. As we have heretofore found, however, there is no evidence that any vending machine operator ever claimed that the plaintiff was not authorized to receive the bonus payments.

■ Lorillard further contends that the plaintiff could not have furnished the certification required in its letter of December 15, 1976, because the plaintiff did not have a signed contract appointing him as collecting agent with each of the vending machine operators for whom he was reporting. We find that when the plaintiff first started his reporting service, he did insist upon having an agreement signed by each cigarette vending machine operator that appointed him as the collecting agent for the bonus payments due to the vending machine operator. Later in the operation of his reporting service, the plaintiff did not always obtain such a signed agreement for each cigarette vending machine operator for whom he was reporting. In those situations where he did not have a signed agreement, however, the vending machine operators did authorize the plaintiff to collect the bonus payments for them. We find that the plaintiff's failure to obtain a signed contract appointing him as agent to collect the bonus payments does not relieve Lorillard of its obligation to pay the plaintiff for the reports he submitted to it for the first quarter of 1978. The plaintiff did not materially breach his contract with Lorillard. *Formigli, supra; Jennings, supra.*

■ Under the law of Pennsylvania, the defendant Lorillard could, of course, be compensated in damages for any harm it suffered by reason of the plaintiff's failure to obtain a signed contract appointing him as collecting agent from a vending machine operator. *Formigli, supra; Borough of Greentree v. Tortorete*, 205 Pa.Super. 532, 211 A.2d 76 (1965). As we heretofore pointed out, however, no evidence of any damage suffered by Lorillard has been presented, and no damages are claimed by Lorillard. As a matter of fact, it has been stipulated by the parties (N.T. 9.21) that "if the plaintiff is entitled to recover anything," it is $5,631.98. This Court having found that the plaintiff has substantially performed the contract, judgment will be entered for the plaintiff, Richard Schoenkopf, and against the defendant, Lorillard, for $5,631.98.

### IV. *Other Claims*

The plaintiff's complaint contained five counts. Count I alleged the Sherman Act violations, Count II alleged the violations of the Robinson-Patman Act, and Count V set forth the claims for breach of contract. The plaintiff, in the final pretrial order, as well as at the bar of this Court (N.T. 9.13), made no claim and presented no evidence in connection with Count III and Count IV of his complaint.

This Memorandum is in lieu of findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). An appropriate order will accordingly be entered.

### ORDER

AND NOW, this 18th day of January, 1980, the Court, for the reasons set forth in the Court's Memorandum dated January 18th, 1980, hereby:

ORDERS that in connection with the plaintiff's claims that the defendants violated the Sherman Act, a verdict was directed for the defendants, and judgment is entered for the defendants, R. J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, and Loew's Theatres, Inc., and against the plaintiff, Richard Schoenkopf;

AND it is FURTHER ORDERED that in connection with the plaintiff's claims that the defendants violated the Robinson-Patman Act, the injunctive relief requested by the plaintiff is DENIED, and judgment is entered for the defendants, R. J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, and Loew's Theatres, Inc., and against the plaintiff, Richard Schoenkopf;

AND it is FURTHER ORDERED that in connection with the plaintiff's breach of contract claims, judgment is entered for the plaintiff, Richard Schoenkopf, and against the defendant, R. J. Reynolds Tobacco Company, for $22,357.75; judgment is entered for the plaintiff, Richard Schoenkopf, and against the defendant, Brown & Williamson Tobacco Corporation, for $5,650.00; and judgment is entered for the plaintiff, Richard Schoenkopf, and against the defendant, Loew's Theatres, Inc., for $5,631.98;

AND it is FURTHER ORDERED that all parties shall bear their own costs.